**In The Matter of KERO–SUN, INC., Debtor.**

**Bankruptcy No. 2–83–00764.**

United States Bankruptcy Court, D. Connecticut.

March 12, 1986.

See also, 44 B.R. 121.

Isidor E. Leinwand, and Robert R. Leinwand, Javits, Robinson, Brog, Leinwand & Reich, New York City, Michael P. Berman,

Berman & Sable, Hartford, Conn., for debtor.

Barbara A. Kaplan, and Lewis Kruger, Stroock & Stroock & Lavan, New York City, applicant.

Charles M. Needle, Zeldes, Needle & Cooper, Bridgeport, Conn., for Creditors' Committee.

Richard S. Lipman, Schatz & Schatz, Ribicoff & Kotkin, Hartford, Conn., for Toyotomi Kogyo Co., Ltd., creditor.

Richard L. Levine, Hill & Barlow, Boston, Mass., and Richard F. Casher, Hebb & Gitlin, Hartford, Conn., for State Street Bank & Trust Co., The Connecticut Nat. Bank, Security Pacific Nat. Bank, Canadian Imperial Bank of Commerce and Swiss Bank Corp.

## AMENDED MEMORANDUM OF DECISION ON APPLICATION OF STROOCK & STROOCK & LAVAN FOR FINAL ALLOWANCE OF COMPENSATION AND MOTION OF KERO–SUN, INC. FOR EXAMINATION OF FEES RECEIVED BY STROOCK & STROOCK & LAVAN

ROBERT L. KRECHEVSKY, Chief Judge.

### I.

The court, on October 16, 1985, confirmed a plan of reorganization in the chapter 11 case of the debtor, Kero-Sun, Inc. (Kero-Sun), and has now concluded hearings on applications for final compensation for professional persons. A ruling on the compensation application of Stroock & Stroock & Lavan (Stroock) as a former attorney for Kero-Sun, debtor-in-possession, and Kero-Sun's motion for the examination of the reasonableness of all fees received from all sources by Stroock, heard jointly prior to plan confirmation, has been deferred pending the filing and hearing of all applications seeking administrative expense priority. The court is now prepared to rule.[1]

**1.** The court issued its original memorandum of decision on January 31, 1986. On February 10, 1986, Stroock filed a motion, granted by the court, to present additional evidence to be re-

As events have turned out, the predominant issue for the court to resolve is the appropriate action to be taken for Stroock having filed an incomplete and incorrect statement concerning the compensation paid or agreed to be paid to Stroock. Stroock failed to disclose when its employment as attorney for Kero-Sun, debtor-in-possession, was approved, a prepetition arrangement it had made with certain secured creditors of Kero-Sun to be paid a fee of $75,000.00 by such creditors. Neither did Stroock report the payment of these monies when received postpetition. Stroock has pleaded inadvertence for its failure initially to disclose the fee arrangement and its subsequent neglect to report the receipt of the $75,000.00.

### II.

The bankruptcy case of Kero-Sun started with an involuntary petition for relief under chapter 7 of the Bankruptcy Code filed on October 13, 1983 by three creditors. The court, after a hearing held on December 1, 1983, denied Kero-Sun's motion to dismiss the petition and entered an order for relief. Stroock was present at the hearing during which Kero-Sun and the secured creditors jointly argued for dismissal for the purpose of permitting the secured creditors to retain possession of and to liquidate Kero-Sun property.

On December 6, 1983, Kero-Sun exercised its right to convert the case to one under chapter 11. On December 16, 1983, Kero-Sun filed an application for authority to retain Stroock as its bankruptcy counsel *nunc pro tunc* to November 30, 1983. The application stated, *inter alia,* that Stroock was experienced in reorganization matters; that it was essential for Kero-Sun to retain competent counsel in its chapter 11 case; that Stroock should be retained under a general retainer; and that Stroock represented no interest adverse to the debtor or to the estate. An affidavit prepared by Arthur N. Ohringer (Ohringer), a senior associate member of the Stroock firm, accompanied the application and averred that Kero-Sun had consulted with the firm during the past year and that the firm had no interest adverse to the debtor or to the estate. The court, *ex parte,* approved the application on December 16, 1983.

Section 329(a) of the Bankruptcy Code, entitled "Debtor's Transactions with Attorneys", states:

Any attorney representing a debtor in a case under this title, or in connection with such a case, whether or not such attorney applies for compensation under this title, shall file with the court a statement of the compensation paid or agreed to be paid, if such payment or agreement was made after one year before the date of the filing of the petition, for services rendered or to be rendered in contemplation of or in connection with the case by such attorney, and the source of such compensation.

Bankruptcy Rule 2016(b) supplements § 329 by requiring that:

[e]very attorney for a debtor, whether or not the attorney applies for compensation, shall file with the court on or before the first date set for the meeting of creditors, or at another time as the court may direct, the statement required by § 329 of the Code....

On December 20, 1983, Stroock filed an affidavit, drafted by Ohringer, and sworn to on December 14, 1983 by a Stroock partner unfamiliar with this case, entitled "Disclosure of Compensation." The affidavit, in pertinent part, read as follows:

2. This statement is made pursuant to 11 U.S.C. § 329 and sets forth the source and amount of compensation paid or ·agreed to be paid to Stroock & Stroock &

---

ceived solely through the affidavits attached to its motion concerning the drafting and execution of the disclosure of compensation affidavit, and the chronology of events relating to Stroock's efforts to respond to court inquiries. Stroock did not seek to amend or alter the relief awarded, and has complied with the court's order. Further, two individual Stroock firm members requested an opportunity, by way of affidavit, to establish their lack of personal knowledge of the events described in section III *infra* on the date of the filing of the disclosure of compensation affidavit.

Lavan by the debtor above-named, for legal services rendered or to be rendered by Stroock & Stroock & Lavan to said debtor and debtor-in-possession in connection with this chapter 11 case.

3. Stroock & Stroock & Lavan has been paid for all legal services rendered and recorded to November 30, 1983 and for all out-of-pocket expenses incurred and recorded to November 30, 1983, and has received the sum of $62,572.20 from the debtor, as a retainer, against fees for legal services rendered or to be rendered in connection with this case on and after November 30, 1983.

4. In addition, the debtor has agreed to pay Stroock & Stroock & Lavan for legal services rendered or to be rendered, compensation for such services at the normal hourly rates charged by Stroock & Stroock & Lavan to any of its clients for services rendered by those attorneys and paraprofessional persons who render services to the debtor, and to reimburse Stroock & Stroock & Lavan for its out-of-pocket expenses incurred in connection with rendering such services, all such amounts being subject to court approval after a hearing upon application for such compensation.

Stroock admits that this affidavit is incorrect and incomplete. Stroock concedes that one of its partners, Lewis Kruger, (Kruger), had a prepetition agreement (of which Ohringer, when he prepared the affidavit, was unaware) with State Street Bank & Trust Company, The Connecticut National Bank, Security Pacific National Bank, Canadian Imperial Bank of Commerce and Swiss Bank Corporation (hereinafter "the Banks"), secured creditors of Kero-Sun with a debt in excess of 30 million dollars, to be paid $75,000.00 in connection with the Kero-Sun insolvency matter. Stroock acknowledges that on or about December 29, 1983, it received the $75,000.00 from the Banks and failed to amend its disclosure of compensation statement or otherwise advise the court of the payment until after being notified to do so by the court. Stroock's fee application reveals that during the period covered by § 329(a),[2] it had received $155,500.00 in fees, not merely $62,572.20. Testimony later established that the $62,572.20 acknowledged in the affidavit came from a Kero-Sun subsidiary and not the debtor.

### III.

Kruger, a Stroock senior partner, testified to the following sequence of events surrounding the Banks' payment of $75,000.00 to Stroock. Kruger was initially contacted by Kero-Sun in January, 1983 concerning Kero-Sun's financial problems. Kero-Sun, a world-wide distributor of kerosene heaters, was in serious financial difficulty because of a cash shortage, threatened curtailment of credit by the Banks, and an excessive inventory. Kruger was again contacted in June, 1983, when the Banks had indicated an intention to exercise their remedies under their security documents. The Banks claimed a security interest in substantially all of Kero-Sun's assets. For the next three months, Kruger negotiated for Kero-Sun with the Banks. These negotiations resulted in two agreements dated September 7, 1983, which would place the Banks in peaceful possession of Kero-Sun's assets, with the Banks undertaking to liquidate the assets through Alco Capital Corp. (Alco). All proceeds of the liquidation, after expenses, were first to be paid to the Banks, with a guarantee by the Banks that a minimum of one million dollars would be available for Kero-Sun.

Through August, 1983, Kero-Sun paid Stroock a total of $80,500.00 in fees. Believing that Kero-Sun had or would run out of cash, Kruger in August, 1983 approached Richard L. Levine, the lead attor-

---

**2.** Section 329(a) requires disclosure of any payment or compensation agreement "made after one year before the date of the petition." All of the payments from Kero-Sun to Stroock were made after one year before the filing of the petition, i.e., after October 13, 1982. Stroock started conditionally preparing a voluntary bankruptcy petition for Kero-Sun on August 1, 1983.

ney for the Banks, and threatened to leave the ongoing negotiations unless the Banks agreed to pay Stroock's continuing legal fees. Kruger testified he told the Banks: "It would be very difficult to find counsel prepared to work if there was no prospect of being paid." In the latter part of August, the Banks agreed to pay the Stroock legal fees up to $75,000.00. The September 7, 1983 agreements between Kero-Sun and the Banks were thereafter concluded, and the Banks took over the Kero-Sun inventory.

During this period, Kruger stated that he was also negotiating with certain unsecured creditors to promote Kero-Sun's belief that the agreements with the Banks would be beneficial in that they allowed Kero-Sun to retain its trademark, to be free from bank debt, and to have a minimum of one million dollars to fund a workout with unsecured creditors. Three unsecured creditors were dissatisfied with the arrangement and filed the involuntary petition against Kero-Sun on October 13, 1983. Kruger had not by that date received the promised $75,000.00 from the Banks. He started to make frequent telephone calls to Levine requesting payment. Levine, who testified at the hearing as a Stroock witness, stated that the Banks had agreed to pay the $75,000.00 demanded by Kruger with some reluctance, but acceded for two reasons. First, Levine said, the Banks needed Kero-Sun to have experienced counsel to talk to, and, additionally, Kero-Sun needed competent legal advice so as not to collapse totally and thereby seriously diminish the value of the Banks' collateral. Levine stated that the promise to pay was a "contract which was enforceable against the banks and whether the banks could in turn get a charge against the debtor was not something that Mr. Kruger was involved with at the time I made the agreement with him." Levine stated he delayed having the Banks make the payment until the end of December, 1983 out of "stub-

bornness, annoyance of having been harassed...." Levine was the original head of the United States Trustee program and is a former member of The Judicial Conference Advisory Committee on Bankruptcy Rules.

On October 13, 1983, the date of the filing of the bankruptcy petition, Stroock's books reflected that it had been paid for all legal services. In November, 1983, Stroock received $75,000.00 from Charles Tusa, a Kero-Sun attorney, who had, in turn, secured the money from a corporation wholly owned by Kero-Sun. The December 14, 1983 disclosure of compensation statement recited that as of November 30, 1983, Stroock had a credit balance with the debtor of $62,572.22.[3] When Stroock received the additional $75,000.00 from the Banks at the end of December, 1983, it made no effort to revise its compensation disclosure statement or otherwise to notify the court.

In this district, estate administrators review all monthly operating reports of chapter 11 debtors. The estate administrator at Hartford, Attorney Joan E. Pilver, noted that the debtor's report for December, 1983 showed an entry of $251,148.00 "for professional services." On January 25, 1984, she wrote Ohringer and requested that she be advised as to whom the payments for professional services were made and for what purposes. She added: "As you are aware, payment for 'professional services' must first be approved by the court." She received no response. On March 7, 1984, she again wrote Ohringer, stating that unless a response was received, "I intend to take this matter up with Judge Krechevsky." By letter dated March 22, 1984, Ohringer responded:

Annexed hereto please find the list of professionals and others and the amounts each received which total $251,-148.00, a number which appeared in the statement of operations submitted by Kero-Sun, Inc. for the period ended De-

---

3. Ohringer avers he received the information as to the total amount of fees paid by Kero-Sun from the Stroock accounting staff who advised him only of one $75,000.00 payment received

during November, 1983. Ohringer is at a loss to explain why Stroock's accounting system failed to disclose the additional $80,500.00 Stroock had received during the prior year.

cember 31, 1983. The schedule was prepared by Mr. Guy Bradford from records available.

Please note that these disbursements were actually made by Alco Capital Corp. out of its fund for liquidation expenses and not made by Kero-Sun, Inc. itself. It is my understanding that when the December operating statement was prepared, Kero-Sun, Inc. personnel assumed that the liquidation expenses disbursed by Alco Capital Corp. should be reported as Kero-Sun, Inc. operations, but this has resulted in confusion rather than clarification.

I trust the foregoing is responsive to your request for information.

Accompanying the letter was a schedule of disbursements and included within the disbursements were "Attorneys: Stroock, Stroock & Lavan 12/29 Ck # 11466 $75,-000.00."

Estate Administrator Pilver brought this letter to the court's attention. By letter to Ohringer dated March 28, 1984, she advised that, at the Judge's request, Ohringer shall furnish "additional information and any supporting documents" and "the facts surrounding the payment of $75,000 by Alco Capital to your office." Ohringer did not respond until May 8, 1984, when he sent the following letter to the court:

Reference is made to a letter addressed to the undersigned by Joan E. Pilver, dated March 28, 1984, respecting $75,000 received by this office late in December 1983 or in early January 1984 from Alco Capital Corp., concerning which you requested information.

During September and October 1983, we were acting as insolvency counsel to Kero-Sun, Inc., and were negotiating an out-of-court settlement with an unofficial committee of creditors. At that time the bank secured creditors had a security interest in virtually all of the assets of Kero-Sun, Inc. They recognized that counsel would require payment for ser-

vices and perceived that representation of Kero-Sun, Inc., in negotiations with creditors and in any ensuing bankruptcy proceedings, by experienced counsel, would redound to their benefit in terms of protecting and preserving the value of the collateral, of which they had obtained peaceful possession and which they were liquidating in an orderly manner. The banks stated that they would advance $75,000 to Stroock & Stroock & Lavan in consideration of their perceived benefit. Please note that their commitment was made prior to the filing of the involuntary petition in this case.

They directed Alco Capital Corp., their agent, to send the funds to Stroock & Stroock & Lavan. The first check sent was apparently lost in the mail and a replacement check was sent to us late in December 1983. Although received from a third party, Stroock & Stroock & Lavan has escrowed the funds received and intends to treat same as an additional retainer, for the benefit of Kero-Sun, Inc., to be accounted for in any application for compensation and reimbursement of expenses filed in this case.

I trust the foregoing provides you with the explanation you requested, however if anything further is required please so advise.

At about the same time this letter was received, Kero-Sun filed an application to substitute Leinwand, Gerton & Leinwand (Leinwand)[4] as counsel for the debtor-in-possession in place of Stroock. On or about December 23, 1983, a group of entities allied with or controlled by Schottenstein Stores Corporation (the investors) had acquired both the interest of the Banks in its secured position and an option to buy all of the Kero-Sun capital stock. The investors thereafter also acquired a substantial portion of Kero-Sun's unsecured debt. It was the investors' decision to replace Stroock with Leinwand. On May 9, 1984, the day after Ohringer forwarded his letter

---

4. Leinwand, Gerton & Leinwand is now known as Javits, Robinson, Brog, Leinwand & Reich, P.C.

to the court, Stroock signed a consent to such substitution. The court set a hearing for May 23, 1984 on the application, and on that date granted approval of the application for substitution of attorneys. Stroock did not appear at the hearing, and the court *sua sponte* instructed Leinwand to bring on for hearing the matters of fees received by Stroock from all sources.

### IV.

Stroock's fee application requests $126,-698.70 as reasonable compensation and $8,065.98 reimbursement for expenses. With the retainer balance of $62,572.20 on hand mentioned in its December 14, 1983 "Disclosure of Compensation", and the subsequent receipt of $75,000.00 from the Banks, Stroock has already received monies exceeding the amount it requests in its fee application. After making certain corrections, Stroock apparently acknowledges it is currently holding a credit balance of $7,717.72 to be returned to the estate if its application is approved as submitted.

An official committee of creditors holding unsecured claims (committee) was appointed in this case, and the committee appeared and actively participated in all proceedings. In a memorandum filed on January 22, 1985, the committee requested the court to reduce the fee sought by Stroock on the grounds of excessiveness and to apply sanctions against Stroock. The committee contended that Stroock's § 329 statement "falls far short of compliance with this Bankruptcy Code provision" in the following ways: (1) failure to disclose the agreement to receive $75,000.00 from the Banks, parties potentially adverse to Kero-Sun, (2) failure to disclose all compensation received by Stroock during 1983 in connection with the Kero-Sun insolvency, and (3) failure to disclose all sources of funds such as receipt in November, 1983 of $75,000.00 from a Kero-Sun subsidiary. The committee asserted that full and correct information in each of these three areas could have been meaningful in its deliberations. The committee stressed Stroock's lack of professional candor and

forthrightness in failing to appropriately respond for three and one-half months, once the estate administrator wrote to Stroock for an explanation. On the other hand, the committee's memorandum stated that the committee was willing to accept Stroock's indication that "its noncompliance was as a result of inadvertence rather than an intentional course of action designed to circumlocate [sic] the bankruptcy disclosure requirements" and requested the court to impose "sanctions that will be proportional to the wrongs committed." Leinwand, on behalf of Kero-Sun, did not submit a post-hearing memorandum.

As noted at the outset of this ruling, the court confirmed Kero-Sun's plan of reorganization on October 16, 1985. The plan, *inter alia*, provided for an immediate cash payment of eighty-five percent of allowed unsecured claims, not including those acquired by the investors, in full settlement of all monies due from Kero-Sun. This provision has been consummated and such creditors have been paid. The committee, by its counsel, has disclaimed any further monetary interest in the court's ruling concerning Stroock's fees. Leinwand, Kero-Sun's present counsel, advised the court by letter dated December 19, 1985, that the "Debtor hereby withdraws any objection heretofore filed with regard to the final Application for Allowance filed by Stroock & Stroock & Lavan and will take no position on the Court's award thereon." In view of these events and concessions, this ruling will address only Stroock's contention that no sanctions should be imposed for its admitted violation of § 329(a).

### V.

Stroock, on December 10, 1984, filed a separate memorandum limited in scope "to the issue of Stroock's receiving a portion of its fees from certain secured creditors of the Debtor and failing to disclose such compensation in a timely fashion." Stroock, after asserting the nondisclosure was "[t]hrough pure inadvertence", argues that Congress's purpose in enacting § 329(a) was to protect the debtor's dwindling as-

sets from overreaching by the debtor's attorney, and the disclosure requirements of § 329(a) are "subsidiary" to this specific concern. The memorandum states that for the court "to apply [§ 329(a)], nonetheless, in a blanket fashion to circumstances not addressed by Congress so as to deprive counsel of compensation to which it is otherwise clearly entitled would be a harsh result. Such an application of § 329(a) would seriously distort Congress' intent in promulgating that section while serving no clear equitable end." *Stroock memo.* at 6.

Stroock further claims that both the Bankruptcy Code and the Code of Professional Responsibility permitted Stroock to be paid by a creditor of the estate. The law firm refers to Kruger's testimony that it is a common practice for secured lenders to pay a debtor's attorney's fees in pre-bankruptcy situations and contends that § 506(c) of the Bankruptcy Code carries that practice over into bankruptcy.[5] Stroock maintains that Disciplinary Rule 5–107(A) of the Code of Professional Responsibility[6] by "negative implication" permits a lawyer "to accept payment from a third party where his client has consented to the arrangement." It is Stroock's position that Kero-Sun's management "welcomed the opportunity, provided by the Banks' offer of payment, to be represented by experienced bankruptcy counsel. Thus, Stroock's acceptance of the Banks' promise to pay a portion of its fees met with both the form as well as the substance of the Code of Professional Responsibility." *Stroock memo.* at 13–14.

**5.** Section 506(c) provides:
   The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim.

**6.** Code of Professional Responsibility DR 5–107(A) (Conn.Prac.Book 1985) states:
   Except with the consent of his client after full disclosure, a lawyer shall not:
   (1) accept compensation for his legal services from one other than his client.

**7.** The court of appeals in this circuit has recently noted that a secured creditor may consent in the bankruptcy court to bearing the cost of

Stroock concludes by conceding that its failure to disclose the creditors' promise to pay a portion of its fees "was not in accordance with the letter of the Bankruptcy Code and Rules" but that its "error has ... been outweighed by its performance in this case and the benefits thereby conferred on all parties to this proceeding." *Id.* at 14.

## VI.

I am unpersuaded by the reasons advanced by Stroock as to why a court should ignore Stroock's violation of § 329(a) or treat it as *de minimis.* A common theme underlying all Stroock arguments is its assertion that in out-of-court debtor and creditor negotiations, a secured creditor frequently funds a distressed company's legal fees.[7] That assertion, however, misses the point. We are concerned here with a situation in which the court and the estate creditors were advised neither of the fee arrangement nor of the subsequent acceptance of fees by Stroock.

■ Stroock's attempt to limit Congress's concern in § 329(a) to disclosure of fees paid or agreed to be paid by the *debtor* for services is unconvincing. Attorneys employed in the administration of a bankruptcy estate are required, under 11 U.S.C. § 327(a), to be disinterested persons and to hold no interest adverse to the estate.[8] To aid the court in determining whether an attorney is so qualified, the Bankruptcy Code and Rules require disclosure, before approval of employment, of all the attorney's connections with the debtor, credi-

professional fees incurred by a debtor-in-possession. *See General Electric Credit Corp. v. Levin & Weintraub (In re Flagstaff Foodservice Corp.),* 739 F.2d 73, 76–77 (2d Cir.1984).

**8.** 11 U.S.C. § 327(a) provides:
   Except as otherwise provided in this section, the trustee, with the court's approval, may employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title.

tors, or any other party-in-interest.[9] Recent opinions in this Circuit have dealt extensively with disclosure violations and the propriety of denying compensation in such instances. *Futuronics Corp. v. Arutt, Nachamie & Benjamin (In re Futuronics Corp.)*, 655 F.2d 463 (2d Cir.1981); *In re Arlan's Department Stores, Inc.*, 615 F.2d 925 (2d Cir.1979). As Stroock notes, the House and Senate Reports did reflect Congressional concern about disclosure of the use of debtor assets for attorneys.

> Payments to a debtor's attorney provide serious potential for evasion of creditor protection provisions of the bankruptcy laws, and serious potential for overreaching by the debtor's attorney, and should be subject to careful scrutiny.

H.R.Rep. No. 595, 95th Cong., 1st Sess. 329, *reprinted in* 1978 U.S.Code Cong. & Ad.News 5963, 6285; S.Rep. No. 989, 95th Cong., 2d Sess. 39, *reprinted in* 1978 U.S. Code Cong. & Ad.News 5787, 5825. But this is hardly the only danger Congress intended § 329(a) to address. The statutory language is not so limited; it requires disclosure of "the source of such compensation." If § 329(a) were intended primarily to address payments by debtors, the foregoing phrase would be superfluous. Moreover, Stroock's suggestion ignores the additional concerns addressed in § 327(a) resulting from undisclosed payment by parties in interest to a debtor's attorney. By agreeing to accept payment from certain creditors of the debtor, thereafter accepting such monies, and failing to report any of these events, Stroock created the appearance of a conflict of interest.

■ Stroock is on no better ground in its view that the knowledge of Kero-Sun's prebankruptcy management that Stroock had agreed to accept fees from the Banks kept it from a perceived violation of any profes-

sional ethic. Stroock's position as prepetition counsel to Kero-Sun is not the same as its fiduciary status as an approved officer of this court based upon Stroock's affirmation that it was a disinterested party holding no adverse interest. Kero-Sun's management's knowledge was not imputed to the Kero-Sun estate when the court approved Kero-Sun's petition to employ Stroock as counsel to it as a debtor-in-possession.

> The duty of counsel for the debtor in a bankruptcy proceeding to disclose fully to the court all connections that may exist between counsel and the debtor, the creditors, any party in interest, and their respective attorneys arises not solely by reason of the bankruptcy rules, but also is founded upon 'the fiduciary obligation owed by counsel for the debtor to the bankruptcy court'.

*In re Futuronics Corp., supra*, 655 F.2d at 470.

■ Section 506(c) of the Bankruptcy Code nowhere suggests that an attorney for a debtor-in-possession may claim and receive from a secured creditor monies for services based upon a claimed benefit to the creditor conferred by such attorney. The statute refers to the "trustee" recovering costs and expenses for the estate to the extent of any benefit to the secured creditors. *See In re Energy Cooperative, Inc.*, 55 B.R. 957, 964 n. 21 (Bankr.N.D.Ill.1985). The rule in this Circuit is that this does not include benefits to the secured creditor that are incidental to the reorganization effort. *See General Electric Credit Corp. v. Levin & Weintraub (In re Flagstaff Foodservice Corp.)*, 739 F.2d 73, 76 (2d Cir.1984).

Stroock's concluding position asks the court to consider the relatively significant benefit realized by unsecured creditors in

---

**9.** *See supra* at 772. *See also* Bankruptcy Rule 2014(a):

*Application for and Order of Employment.* An order approving the employment of attorneys, accountants, appraisers, auctioneers, agents, or other professional persons pursuant to § 327 or § 1103 of the Code shall be made only on application of the trustee or committee, stating the specific facts showing the necessity for the employment, the name of the person to be employed, the reasons for his selection, the professional services to be rendered, any proposed arrangement for compensation, and, to the best of the applicant's knowledge, all of the person's connections with the debtor, creditors, or any other party in interest, their respective attorneys and accountants.

this reorganization case. This argument has not been found exonerative in our Circuit or by the Supreme Court. In referring to improper fee-sharing arrangements, the court of appeals stated that whether there was any discernible harm to the bankruptcy estate or its creditors is of no moment in considering whether to deny compensation to attorneys who engaged in such practice. *In re Futuronics Corp., supra,* at 471. The leading authority is *Woods v. City National Bank & Trust Co.,* 312 U.S. 262, 61 S.Ct. 493, 85 L.Ed. 820 (1948), in which the Supreme Court held that professional compensation may be denied attorneys who have served dual or conflicting interests. The Court stated:

> It is no answer to say that fraud or unfairness were not shown to have resulted. The principle enunciated by Chief Justice Taft in a case involving a contract to split fees in violation of the bankruptcy rules, is apposite here: "What is struck at in the refusal to enforce contracts of this kind is not only actual evil results but their tendency to evil in other cases." Furthermore, the incidence of a particular conflict of interest can seldom be measured with any degree of certainty. The bankruptcy court need not speculate as to whether the result of the conflict was to delay action where speed was essential, to close the record of past transactions where publicity and investigation were needed, to compromise claims by inattention where vigilant assertion was necessary, or otherwise to dilute the undivided loyalty owed to those whom the claimant purported to represent. Where an actual conflict of interest exists, no more need

be shown in this type of case to support a denial of compensation.

312 U.S. at 268, 61 S.Ct. at 497 (citations omitted).

In *In re WPMK, Inc.,* 42 B.R. 157 (Bankr.D.Hawaii 1984), an attorney for a debtor-in-possession received $20,000.00 postpetition from three investors of the debtor, which monies he failed to disclose in his § 329(a) report. He had an understanding to reimburse the investors upon court approval of a fee application. The attorney argued that the court should not impose sanctions without a "finding of *actual* conflict of interest." 42 B.R. at 163 (emphasis in original). The court (Chinen, Bankruptcy Judge) ordered all monies returned to the estate and ruled that "[a]n attorney representing a debtor should not receive payment, either directly or indirectly, from any of the creditors." The court quoted *Woods v. City National Bank & Trust Co., supra,* that "[i]t is no answer to say that fraud or unfairness were not shown to have resulted." *Id.*

### VII.

■ The court views the deficiencies in the Stroock disclosure of compensation statement and Stroock's lack of attentiveness to their cure as serious.[10] This is so notwithstanding the fact that no party to these proceedings claims that Stroock at any time did not act in the best interest of the estate. The creditors' committee specifically accepts Stroock's statements that there was no intentional course of conduct by Stroock to avoid the requirements of § 329(a). The doctrine in this Circuit has uniformly been to decide Bankruptcy Code and Rule disclosure violations with an in-

---

10. Stroock asserts that Kruger's failure to advise Ohringer of the Bank's promises to pay such fees was the sole cause of the filing of the incorrect affidavit. This communication failure was compounded by Stroock's failure to report the actual receipt of the fees, and the entire chain of events was further aggravated by the excessive period it took Stroock to disclose to the court the true nature of the $75,000.00 payment after being notified by the court to do so. Ohringer explains his original lack of response to Estate Administrator Pilver's letter of January

25, 1984 by reason of his being occupied with other business in California during February, 1984 coupled with a ten-day personal vacation in March. Ohringer claims that when he received Estate Administrator Pilver's March 28, 1984 letter, he approached Kruger for advice on how to respond. He contends that due to pressure of business and Kruger's frequent out-of-town trips, he obtained the necessary information from Kruger only a few days before he prepared his letter of May 8, 1984.

flexible standard. No exceptions are to be made based upon inadvertency (slipshodness) or good faith. In the seminal case of *General Motors Acceptance Corp. v. Updike (In re H.L. Stratton, Inc.)*, 51 F.2d 984 (2d Cir.1931), the court denied compensation to attorneys for a bankruptcy receiver because, *inter alia*, the attorneys' disclosure affidavit failed to state with specificity the law firm's prepetition representation of a bank that had asserted an offset against the receiver. The law firm had, in fact, disclosed this information orally to a judge (Bondy) who had formerly sat on the case, but not to the judge (Mack) who approved the appointment. The *Stratton* court (per Augustus Hand, J.) said:

> We ought to say at the outset that we find no intention to violate the rules, or other moral culpability in the conduct of any of the attorneys. They disclosed to Judge Bondy the relations of the bankrupt with the trust company, and the receivers selected a lawyer of ability and standing to look into the matter, who found that the set-off taken was proper. If, through any mistake, it had not been, the counsel who have contested some of their actions with acrimony would doubtless have insisted upon further investigation. They may never have thought that they would not be dealing with Judge Bondy when the formal application to appoint attorneys was made and they knew that they had disclosed the situation to the court, but Judge Mack, who actually signed the order, had none of the information given orally to Judge Bondy. Though the attorneys manifestly acted in good faith, their procedure was in disregard of rules made to safeguard insolvent estates and was of the slipshod sort which often has characterized bankruptcy practice. We cannot too emphatically insist that the rules are to be strictly observed and that oral statements made to a judge are no lawful substitute for the affidavits which are prescribed.

51 F.2d at 987. *Stratton* was cited in *In re Futuronics Corp., supra*, at 469, for the proposition that:

> If the rule [on disclosure] is to have vitality and the evils against which it is aimed are to be eliminated, it should be enforced literally. Indeed, it has long been the practice in this circuit to deny compensation to counsel who fail to comply with the disclosure provisions....

■ Stroock's actions do not seem to represent even minimal efforts of a law firm with its exceptional qualifications in the field of bankruptcy law to keep the court and the estate apprised of the firm's compensation and the sources thereof. Stroock's § 329(a) statement failed to specify all the monies received from Kero-Sun in the year preceding bankruptcy; it failed to mention the true source of $75,000.00 of its fees; and it failed to disclose the agreement with the Banks to pay $75,000.00 to Stroock in connection with representation of Kero-Sun in prepetition negotiations. When payment was received pursuant to this agreement on December 29, 1983, no attempt was made to inform the court of the agreement or of the payment. The omission of the fee arrangement with the Banks was not insignificant in view of the opposing positions taken by the Banks and the petitioning creditors on the issue of whether the court should dismiss the petition.

■ It was improper, moreover, for Stroock to pocket the $75,000.00 received from the Banks without disclosure to the court, regardless of Stroock's intention to disclose the sum when it ultimately applied for fees. A debtor's attorney may not receive postpetition payments directly from any interested party, the debtor or otherwise, without disclosure and court review. Finally, Stroock's explanation that the pressure of other business and difficulty in communicating with Kruger excuses the delay from January 25, 1984 to May 8, 1984 in disclosing the questioned arrangement is unacceptable.

Stroock's violation of the disclosure requirements and its subsequent course of conduct lead me to the conclusion that the appropriate sanction is to order Stroock to

forfeit the $75,000.00 it received from the Banks and return this sum to the estate with interest at eight percent per annum from December 29, 1983. If Stroock has not yet done so, the "credit balance" its fee application states it holds, amounting to $7,717.72, shall also be returned to the estate.

This Memorandum shall constitute Findings of Fact and Conclusions of Law mandated by Bankruptcy Rule 7052.