In the Matter of CF HOLDING
CORP., Debtor.

In the Matter of COLT'S
MANUFACTURING CO.,
INC., Debtor.

Bankruptcy Nos. 2–92–01038, 2–92–01039.

United States Bankruptcy Court,
D. Connecticut.

Feb. 17, 1994.

Deryck A. Palmer, Jeffrey L. Tanenbaum, Kevin P. Hughes and Alistaire Bambach, Weil, Gotshal & Manges, New York City, Robert A. White and Brendan M. Fox, Jr., Murtha, Cullina, Richter & Pinney, Hartford, CT, for CF Holding Corp. and Colt's Mfg. Co., Inc., debtors.

Arthur J. Gonzales, Acting U.S. Trustee, Region II, and Keith N. Costa, Sr. Atty., U.S. Trustee, New Haven, CT.

John B. Nolan and Jeffrey G. Grody, Day, Berry & Howard, Hartford, CT, for Creditors' Committee.

Robert U. Sattin, Reid and Riege, P.C., Hartford, CT, for State of Connecticut Retirement Plan.

Gene E.K. Pratter, Duane, Morris & Heckscher, Murtha, Cullina, Richter & Pinney, Hartford, CT, for Zolfo, Cooper & Co.

Peter W. Benner, Shipman & Goodwin, Hartford, CT, for Connecticut Development Authority.

## AMENDED RULING ON OBJECTIONS TO FEE APPLICATIONS

ROBERT L. KRECHEVSKY, Chief Judge.

### I.

### ISSUES

This ruling deals with two of the final fee applications filed in these chapter 11 cases. The first issue is whether Zolfo, Cooper & Co. (Zolfo, Cooper), special financial advisor and bankruptcy consultant to C.F. Holding Corp. (Holding) and Colt's Manufacturing Co., Inc. (Colt's) (together, the debtors), breached its fiduciary obligation when Steven F. Cooper (Cooper), the managing partner of Zolfo, Cooper, agreed during his employment with the debtors to invest $2 million in an entity whose controlling principal was seeking to purchase a majority interest in the reorganized debtors and Zolfo, Cooper then failed to disclose timely such action. A second issue is whether a fiduciary obligation existed requiring Weil, Gotshal & Manges (Weil, Gotshal), as attorneys for the debtors, to take steps to bring the matter before the court after Weil, Gotshal acquired actual knowledge of Cooper's actions. The Creditors' Committee (Committee), supported in part by the Office of the United States Trustee, has raised the issue through objections to the Zolfo, Cooper and Weil, Gotshal fee applications which total over $4.5 million. The

following background is based upon oral argument and extensive briefing with accompanying exhibits submitted by the parties.

## II.

### BACKGROUND

The debtors were formed in 1990 during an intricate, highly leveraged buy-out transaction to acquire the manufacturing operations for the production of the world-famous Colt weapons. Holding is the sole owner of Colt's, the entity which purchased the manufacturing operations in the leveraged buyout. A limited partnership, CF Intellectual Property Limited Partnership (Name Partnership), was simultaneously formed to acquire the trademark, patent, copyright and similar rights to be licensed to Colt's. The limited partners in the Name Partnership also purchased or received stock in Holding. The State of Connecticut Retirement Funds were a major investor, holding a 49.5% partnership interest in the Name Partnership, all of Holding's Class A and B preferred stock, and about 65% of Holding's Class A common stock.

Within two years after their formation, the debtors, on March 18, 1992, filed simultaneous chapter 11 petitions. The court, on application of the debtors, authorized on April 2, 1992 the employment of Zolfo, Cooper as special financial advisors and bankruptcy consultants under a general retainer. An affidavit submitted by Cooper stated that none of the partners or employees of Zolfo, Cooper held any adverse interest to the debtors, their creditors, or any party-in-interest; that Cooper would be the partner responsible for this engagement; and that, in general, Zolfo, Cooper would assist the debtors "in restructuring the business and developing, negotiating and confirming Plans of Reorganization." [1] Cooper Affidavit of March 18, 1992 at 3.

The court authorized the retention of Weil, Gotshal as lead attorneys for the debtors on the same date. The Weil, Gotshal partner in charge of the debtors' cases was Deryck A. Palmer, Esq. (Palmer). Shortly after the filing, the debtors negotiated a $35.5 million postpetition credit agreement with Creditanstalt Bankverein (the Bank), its prepetition lender. The Connecticut Development Agency (CDA) is a lender participant with the Bank.

Cooper originally devoted his efforts to "negotiate a stand-alone plan." Cooper Deposition at 47. Toward the end of 1992, Cooper concluded that the best hope for a successful reorganization lay in the debtors' securing "third-party investors" to make a substantial equity investment. *Id.* at 84. By September 1992, Cooper had spoken to William R. Berkley (Berkley), who had expressed an interest in the possible acquisition of the debtors. Cooper had previously been hired by Berkley during 1989 or 1990 in another bankruptcy case, and they knew each other socially. Cooper, along with Palmer, were also contacting other entities in late 1992 whom they believed might be interested in acquiring the debtors.

Cooper, on January 25, 1993, signed a subscription agreement contracting to invest $2 million in Interlaken Investment Partners, L.P. (Interlaken Investment), a new entity created and controlled by Berkley. On that date Cooper sent a $140,000 check directly to Berkley as the initial payment due on the subscription.

During March 1993, Berkley's interest in the debtors apparently heightened, and Cooper sent to Berkley financial information about the debtors that was no different than information sent to other potential investors. In order to receive such information, Berkley, on March 23, 1992, sent Cooper an executed confidentiality agreement required by the debtors of all interested acquirors. Berkley signed the agreement on behalf of

---

1. Cooper's affidavit further described the firm's qualifications as follows:

   As the premier independent accounting and consulting firm specializing exclusively in advising debtors, creditors, investors and court-appointed officials in formal bankruptcy proceedings and out-of-court workouts, ZC & Co. has significant qualifications and experience in these matters. ZC & Co. has few true competitors matching its quality reputation, breadth of experience, and proven track record for success, earned in serving clients in numerous nationally prominent bankruptcy proceedings. *Id.* at 5.

one of his companies, Interlaken Capital, Inc. (Interlaken Capital). During April 1993, Palmer met several times with Berkley's attorneys, negotiating the terms for the acquisition of a majority interest in the reorganized debtors.

On May 17, 1993, Berkley's agents sent to the debtors a detailed draft letter outlining the terms and conditions for the acquisition by Interlaken Investment, not Interlaken Capital, of a majority interest in the reorganized debtors. At the hearing on the present fee applications, an affidavit from Berkley was received in evidence in which he stated that in "the spring of 1993" he decided to pursue his interest in the debtors "through Interlaken Investment Partners, L.P." Berkley Affidavit at 2. Berkley also averred that "I first talked to Steve Cooper about Colt's when I heard about the company's entry into bankruptcy," and "Steve Cooper never disclosed to me the terms of any competitive bid for Colt's." *Id.* at 2–3.

Cooper sent a letter dated May 21, 1993 to Ronald C. Whitaker (Whitaker), Chairman of the Board of Directors of the debtors, which read as follows:

> This letter is to advise you that I have a personal investment in an entity by the name of Interlaken Investment Partners, L.P. ("Interlaken"). As you know, Interlaken is in the process of making an offer to acquire a substantial equity position in Colt's Manufacturing Company (the "Company"). Given the nature of our retention as financial advisors to the Company, the appearance of a potential conflict and the Bankruptcy Code's requirement of disinterestedness, I am formally requesting that the Board of Directors designate a replacement repesentative [sic] to negotiate with Interlaken the financial terms of an investment in the Company. With respect to all other financial matters, we will continue to represent the Company.
>
> I trust the foregoing is acceptable to the members of the board of directors. Should that not be the case, please advise me immediately.

The debtors' Board of Directors (Board) held a meeting on May 24, 1993 at which the proposal from Interlaken Investment was re-

viewed. Also present were Cooper's principal assistant at Zolfo, Cooper, Randy Waits, and Palmer. The Board discussed as well the merits of a plan of reorganization being jointly proposed by the Committee and the Bank not involving new investor contributions. Whitaker presented Cooper's letter and the "Board then agreed that Mr. Bloom [a Colt's director] would act in Zolfo, Cooper & Company's place in all Interlaken negotiations." Minutes of May 24, 1993 Board Meeting at 2. The meeting was continued to the next day, May 25, 1993, when the "Board agreed that Ron Whitaker should try to meet with [Governor Lowell P. Weicker, Jr.] as soon as possible." *Id.* at 3. The meeting was recessed to May 28, 1993, at which time Whitaker reported that he had met with Governor Weicker who stated that the State of Connecticut did not support a plan involving a new investor. Whitaker also advised the Board that the Bank, as a condition of continued financing, required that Weil, Gotshal and Zolfo, Cooper no longer accrue professional fees. *Id.* at 3–4.

Notwithstanding the State of Connecticut's apparent dislike for a plan involving a third-party investor, the CDA resumed discussions with Berkley. On or about September 27, 1993 the CDA circulated among the parties a draft plan of reorganization identifying a new investor as "[Interlaken Capital, Inc.]."

On November 1, 1993, Berkley's attorneys sent to the separate attorneys for the Committee, the debtors, the Bank and the CDA a document entitled "New Investor Agreement", outlining the terms for the acquisition of 85% of the common stock of the reorganized debtors by Interlaken Investment for a $12 million purchase price. A footnote in the document stated: "Stephen Cooper is a limited partner of the New Investor and is a principal in Zolfo, Cooper & Co., Inc., the Debtors' financial advisors. As a limited partner, Stephen Cooper is a passive investor with no input into investing decisions of the New Investor". New Investor Agreement at 7 n. 1. This was the first notice to the Committee of Cooper's interest in the debtors' potential purchaser.

The CDA and the debtors shortly thereafter became the joint proponents of a plan of reorganization based upon the Interlaken Investment offer. The Third Amended Disclosure Statement approved in connection with this plan included the following statement in the section identifying the "New Equity Investor":

Interlaken Investment Partners, L.P. (the "New Investor") is a Delaware limited partnership with its principal place of business at 165 Mason Street, Greenwich, Connecticut. The New Investor has advised the Proponents that it was formed in November 1992 for the purpose of making equity and other venture capital investments that will generally result in control of private corporations in the United States and abroad, that the general partner of the New Investor is Interlaken Management Partners, L.P. ("Management Partners"), a Delaware limited partnership, that the general partner of Management Partners is Lake Management, Inc., a Delaware corporation, the capital stock of which is owned by William R. Berkley, and that the limited partners of the New Investor are individuals and financial institutions. Stephen Cooper is a limited partner of the New Investor and is a principal in Zolfo, Cooper & Co., Inc., the Debtors' financial advisors. The New Investor has indicated that as a limited partner, Mr. Cooper is a passive investor with no input into investment decisions of the New Investor.

Mr. Cooper has advised the Proponents that when the Debtors determined that a viable plan of reorganization required outside funding, he spoke with several potential investors about the Colt situation, that William Berkley, who manages several investment funds, was one of those individuals, and that in the spring of 1993, Mr. Berkley identified Interlaken as the investment vehicle with which he would pursue his interest in Colt. In May 1993, Mr. Cooper disclosed his passive interest in Interlaken to Colt's Board of Directors and removed his firm from discussions between the parties. Mr. Cooper indicates that neither he nor his firm had any involvement in negotiating the New Investor Agreement.

Mr. Cooper has advised the Proponents that his interest in Interlaken represents 3% of the equity, and that he will receive no remuneration from Interlaken or its affiliates in connection with this transaction other than from his existing investment in Interlaken.

Interlaken Capital, Inc. ("Interlaken Capital"), a Delaware corporation with its principal place of business at 165 Mason Street, Greenwich, Connecticut, provides investment advice and management services to Investment Partners. William R. Berkley owns all of the capital stock of Interlaken Capital.

Third Amended Disclosure Statement at 31.

Several days prior to the hearing on confirmation of the third amended plan of reorganization, Interlaken Investment exercised an option it held to withdraw its offer, and no other plan is presently pending. The parties have jointly represented to the court that a decision on the Committee's and U.S. Trustee's objections to the Zolfo, Cooper and Weil, Gotshal fee applications, hearings on which were held just prior to Interlaken Investment's formal withdrawal of its offer, may aid in the formulation of a new plan.[2]

### III.

### *ARGUMENTS OF THE PARTIES*

The Committee, starting with the Bankruptcy Code's premise that court-approved professionals must be, and remain, disinterested and not hold or represent an interest adverse to the estate, contends that Cooper's purchase of an interest in Interlaken Investment on January 25, 1993 violated that premise. It further asserts Cooper's failure to

---

**2.** At the date of the hearing on the final fee applications, the pending plan of reorganization called for a finite sum to be available for administrative claims, a sum less than the total of pending fee applications. On the date of rendering this ruling, the court has no information as to whether there are, or will be, any unencumbered funds available to satisfy administrative claims. It is possible, therefore, that the fees allowed herein may be subject to further revision in light of these circumstances.

notify the debtors of the conflict in interest thereby created until May 1993, and not to so notify the creditors and other parties-in-interest until November 1993 was prohibited conduct, and that Cooper's solution of simply not having a Zolfo, Cooper employee negotiate with Berkley after May 25, 1993 was entirely inadequate and inappropriate. The Committee argues that the court should not only deny Zolfo, Cooper its unpaid fees, but also require Zolfo, Cooper to disgorge all fees received since the inception of the case.

The Committee asserts that Weil, Gotshal failed in its obligation to the debtors' estate by not requiring that Cooper's involvement with Berkley and Interlaken Investment be brought to the attention of the creditor body and the court, and that on either of two occasions in June 1993 when Palmer addressed the court concerning, *inter alia,* a proper plan for the debtors, Palmer had the opportunity and should have disclosed Cooper's pecuniary interest in a new investor plan. The Committee requests that Weil, Gotshal be denied its unpaid fees, and fees previously paid disgorged by it.

The U.S. Trustee supports the Committee in its claim that there was a clear failure by Zolfo, Cooper to timely disclose Cooper's involvement with a potential purchaser and suggests that the court should deny "compensation at a minimum for the time period that the court determines that such disclosure should have been made to the court and parties in interest." U.S. Trustee Memorandum of December 6, 1993 at 10. Arthur J. Gonzalez, Acting U.S. Trustee, advised the court at the hearing that after submitting the matter to the General Counsel for the U.S. Trustee's Executive Office, it was decided not to support the Committee's argument that Weil, Gotshal had an independent duty to report the lack of disinterestedness of another professional.

Zolfo, Cooper contends it remained disinterested and held no adverse interest until Cooper learned on May 20, 1993 that Berkley intended to use Interlaken Investment as the entity to acquire an interest in the reorganized debtors. Zolfo, Cooper maintains that Cooper's May 21, 1993 letter to the Board was sufficient disclosure and that remaining in the case but removing itself from any further negotiations with Interlaken Investment was the proper action and acceptable to the Board. Zolfo, Cooper also argues that even if the court determines a potential conflict of interest arose at some point, the court, based on the equities of the case, should not deny Zolfo, Cooper any fees incurred prior to the end of May 1993. After May, Zolfo, Cooper, as well as Weil, Gotshal, performed services, but did not accrue fees in accordance with the conditions of Bank financing.

Weil, Gotshal argues that "no case law ... supports" the committee's contention that Weil, Gotshal should be denied all compensation for failing to disclose Cooper's conflict of interest; that Weil, Gotshal "supported the board's designation of Bloom to negotiate the terms of any transaction"; and that Weil, Gotshal "did not breach any fiduciary obligations in these cases." Weil, Gotshal Memorandum of December 9, 1993 at 7–12.

## IV.

### DISCUSSION

#### A.

The Bankruptcy Reform Act of 1978, as amended, (Code), with its provisions requiring that all professionals whose employment is dependent upon court approval comply with high fiduciary standards, represents the considered judgment of Congress. In part due to the common-fund nature of bankruptcy estates, and in part to maintain and promote public confidence in the integrity of the bankruptcy system, Congress enacted strict standards by which a professional's performance is measured. *See In re EWC, Inc.,* 138 B.R. 276, 279 (Bankr.W.D.Okla.1992); *In re Consolidated Bancshares, Inc.,* 785 F.2d 1249, 1256 n. 6 (5th Cir.1986) ("The standards for the employment of professionals are strict, for Congress has determined that strict standards are necessary in light of the unique nature of the bankruptcy process.").

The central provision is Code § 327(a), which states:

> [T]he trustee, with the court's approval, may employ one or more attorneys, accountants, appraisers, auctioneers, or other

professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title.

11 U.S.C. § 327(a). Section 1107(a)[3] makes § 327(a) applicable to professionals retained by a debtor in possession in a chapter 11 case.

Fed.R.Bankr.P. 2014(a) supplements § 327(a) with the following guidelines:

(a) *Application for and Order of Employment.* An order approving the employment of attorneys, accountants, appraisers, auctioneers, agents, or other professionals pursuant to § 327, § 1103, or § 1114 of the Code shall be made only on application of the trustee or committee. The application shall be filed and, unless the case is a chapter 9 municipality case, a copy of the application shall be transmitted by the applicant to the United States trustee. The application shall state the specific facts showing the necessity for the employment, the name of the person to be employed, the reasons for the selection, the professional services to be rendered, any proposed arrangement for compensation, and, to the best of the applicant's knowledge, all of the persons connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee or any person employed in the office of the United States trustee. The application shall be accompanied by a verified statement of the person to be employed setting forth the person's connections with the debtor, creditors, or any other party in interest, their respective attorneys and accountants, the United

States trustee, or any person employed in the office of the United States trustee.

Local R.Bankr.P. 24(a) further provides:

In addition to the requirements set forth in Bankruptcy Rule 2014, all applications for the employment of professional persons shall state whether ... the person has an interest adverse to the estate and the nature of that interest and whether ... the person is disinterested within the meaning of 11 U.S.C. § 101[14].

Section 328(c) provides the penalty if a professional person is not disinterested or holds an interest to the estate on the matter on which he/she is employed:

[T]he court may deny allowance of compensation for services and reimbursement of expenses of a professional person employed under section 327 ... if at any time during such professional person's employment under section 327 ... such professional person is not a disinterested person, or represents or holds an interest adverse to the interest of the estate with respect to the matter on which such professional person is employed.

11 U.S.C. § 328(c). "Section 328(c) acts retrospectively by telling those professionals whose retention under § 327(a) was improper or who, during the case, failed to live up to the substantive requirements of § 327(a) on an ongoing basis while working for the estate that they might lose some or all the compensation to which they might otherwise be entitled." *In re Diamond Mortgage Corp. of Illinois,* 135 B.R. 78, 89 (Bankr.N.D.Ill.1990); *see also In re Tinley Plaza Assocs., L.P.,* 142 B.R. 272, 278 (Bankr.N.D.Ill.1992) (conflicts arising after court approves employment must be immediately disclosed to the court).

"Disinterested person" is a defined term in the Code,[4] while adverse interest is not.

---

**3.** Section 1107(a) provides:

> Subject to any limitations on a trustee serving in a case under this chapter, and to such limitations or conditions as the court prescribes, a debtor in possession shall have all the rights, other than the right to compensation under section 330 of this title, and powers, and shall perform all the functions and duties, except the duties specified in sections 1106(a)(2), (3), and (4) of this title, of a trustee serving in a case under the chapter.
>
> 11 U.S.C. § 1107(a).

**4.** *Section 101. Definitions.*

> In this title—
>
> ....
>
> (14) "disinterested person" means person that—
>
> (A) is not a creditor, an equity security holder, or an insider;
>
> (B) is not and was not an investment banker for any outstanding security of the debtor;
>
> (C) has not been, within three years before the date of the filing of the petition, an investment banker for a security of the debtor, or an

Case law, however, generally holds that the phrase "to hold or represent an adverse interest" means:

1) to possess or assert any economic interest that would tend to lessen the value of the bankruptcy estate or that would create either an actual or potential dispute in which the estate is a rival claimant; or 2) to possess a predisposition under circumstances that render such a bias against the estate.

*In re Tinley Plaza,* 142 B.R. at 277.

■ The disinterested-person test and lack-of-adversity requirement obviously overlap. This court, following the strict constructionist rule of the Second Circuit, *see In re Futuronics Corp.,* 655 F.2d 463 (2d Cir.1981), has previously held that violation of disclosure rules alone is sufficient to partially deny compensation regardless of whether an undisclosed fee arrangement was actually materially adverse to the interest of the estate. *See In re Kero–Sun, Inc.,* 58 B.R. 770, 777–81 (Bankr.D.Conn.1986). *See also In re Tinley Plaza,* 142 B.R. at 278 ("Failure to meet the requirements of Rule 2014(a) is enough by itself" to disqualify and deny compensation.); *In re Glenn Elec. Sales Corp.,* 99 B.R. 596, 599 (D.N.J.1988) ("Reading Rule 2014(a) in conjunction with Section 327, it is clear that any employment arrangements which implicate adverse or non-neutral interests must be brought to the attention of the court."). *Cf. In re Status Game Corp.,* 102 B.R. 19 (Bankr.D.Conn.1989) (Court will refuse approval of employment of attorneys for debtor in possession because of appearance of conflict where attorneys intend to continue representation of estate's major secured creditor in other matters.).

It is also well settled that

Section 328(c) was placed in the Code to provide the court with an optional "penalty" for professionals who entered into a

conflict of interest with the estate. Professionals employed for the estate are under a continuing duty to disclose their connections.

. . . .

... The disinterested requirement is intended to prevent even the appearance of conflict irrespective of the integrity of the person or firm under consideration.

*In re EWC,* 138 B.R. at 282–84 (citations and internal quotations omitted). *See also In re Wiredyne, Inc.,* 3 F.3d 1125, 1127 (7th Cir. 1993) ("The impartiality requirement of Sections 327 and 328 has been interpreted strictly, and a number of courts have held that the distinction between an actual conflict of interest and a potential conflict of interest is artificial.").

### B.

■ Applying these concepts to the conduct of Zolfo, Cooper, the court concludes that at least by January 1993, Zolfo, Cooper became disinterested and held or represented an interest adverse to the debtors' estates, and, thereafter, failed to make timely disclosure to the court and to the entire creditor body. Cooper's decision to invest $2 million in Interlaken Investment, an entity created and controlled by Berkley, when Berkley was in the process of becoming a bidder for the acquisition of the debtors, at the very least, created the appearance of a conflict with Zolfo, Cooper's professional duties in dealing with other potential acquirors. Despite Zolfo, Cooper's argument to the contrary, it is of little significance whether Berkley was negotiating on behalf of Interlaken Capitol or Interlaken Investment. It is also not material that Cooper believed that his investment amounted only to that of a "teeny, tiny limited partner," or that he would always act only with the best interests

---

attorney for such an investment or banker in connection with the offer, sale, or issuance of a security of the debtor;

(D) is not and was not, within two years before the date of the filing of the petition a director, officer, or employee of the debtor or of an investment banker specified in subparagraph (B) or (C) of this paragraph; and

(E) does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor or an investment banker specified in subparagraph (B) or (C) of this paragraph, or for any other reason. . . .

11 U.S.C. § 101(14).

of the debtors' estates in mind.[5] *Cf. In re Envirodyne Indus., Inc.,* 150 B.R. 1008, 1021 (Bankr.N.D.Ill.1993) ("No matter how trivial a connection appears to the professional seeking employment, it must be disclosed.").

■ The parties acknowledge that § 328(c) vests the court with discretionary authority to deny fee applications in whole or in part in light of the statute's use of the word "may." *See In re Diamond Mortgage Corp.,* 135 B.R. at 97. The Committee contends the circumstances call for complete denial, including disgorgement of fees already received. The U.S. Trustee suggests partial denial, and Zolfo, Cooper argues for no denial, even if a violation on its part is found.

After weighing the various arguments of the parties, the court concludes the appropriate exercise of its discretion is to adopt in general the position of the U.S. Trustee. The court will partially deny Zolfo, Cooper's final fee application by taking into account that the disclosure, such as it was, was voluntarily made.

Through November 30, 1992, Zolfo, Cooper had been allowed and paid $1,443,075.82 as interim compensation for services and disbursements, representing 85% of the fees requested. There remains unpaid for that period $254,791.05. For the period starting December 1, 1992 and ending May 31, 1993, Zolfo, Cooper asks for $507,945.50 in compensation and $32,748.04 for reimbursement of expenses. The court hereby denies Zolfo, Cooper's application for all unpaid compensation and expenses,[6] and thus sustains the objections of the Committee and the U.S. Trustee in the amount of $795,484.59.[7]

## C.

■ The issue raised by the Committee's objection to the Weil, Gotshal fee application brings the court, according to both Weil, Gotshal and the U.S. Trustee, into uncharted waters. Weil, Gotshal contends in its memorandum responding to the Committee's objection that "There is no ... authority which imposes upon an attorney a duty to disclose the potential conflicts of interest of another professional, particularly when that professional has himself disclosed the relevant information to the debtor and the debtor has taken effective steps to deal with the conflict." Weil, Gotshal Memorandum at 10.

The court, in section B, *supra,* has determined that Zolfo, Cooper's "disclosure" did not meet the standards imposed by the Code, and that the Board did not take "effective steps" when it simply complied with Cooper's suggestion to change negotiators. Weil,

---

5.   Q. Do you recall when it was that you recused yourself?
     A. As soon as an offer was made. In fact, I think before an offer was made.
     Q. When you say recused yourself, what does that mean?
     A. Well, Berkley has a fund of which I am a teeny, tiny limited partner. In fact, I would characterize it something along the lines of a mutual fund where I am a passive investor, and I have no say in it.
     I don't know what they do today. I think my ownership percentage is in the area of two and a half percent.
     And when Berkley decided to make an offer, he decided to use this fund as the vehicle for whatever reason, and I am not aware of what reason he used.
     I immediately informed Weil Gotshal, the board of directors and the CEO that I had a very very small passive interest in this fund, and notwithstanding that, I had nothing to do with it, nothing to say about it, so on and so forth.
     And I believe I could have been a very effective negotiator, notwithstanding that, but I decided for the sake of appearances that I would immediately drop out of any discussions, negotiations, so on and so on and so on with the Berkley group and I wrote a letter to the board informing them of that.
     Cooper Deposition at 91–92.

6.   At the hearing on its final fee application, Zolfo, Cooper had agreed to a $60,126.78 reduction in compensation for reasons unrelated to this ruling.

7.   In its pre-hearing brief, but not at oral argument, the Committee contended that Cooper had purchased at least 26 weapons from Colt's for the sum of $43,000, in violation of 18 U.S.C. § 154. Section 154 prohibits court officers from purchasing assets from a bankruptcy estate. Zolfo, Cooper's brief in response states that these purchases were under a Colt's Employee Sales Program and clearly not within the intent of § 154. Zolfo, Cooper further noted that $37,000 of the $43,000 spent was for purchases on behalf of Berkley. The court is treating this issue as abandoned by the Committee in the absence of any record made at the hearing.

Gotshal's argument in this respect is not persuasive.

The Code contains a provision, which, if not directly on point, is sufficiently so as to give the court guidance on the question of Weil, Gotshal's responsibility to the debtors' estates. If a trustee had replaced the debtors in these cases, Code § 326(d) would require the court to deny compensation [8] "to the trustee if the trustee failed to make diligent inquiry into facts that would permit denial of allowance under section 328(c) of the title or, with knowledge of such facts, employed a professional person under section 327 of this title." It could have been reasonably anticipated that in light of the duties of an attorney for a debtor in possession, that no lower standard would be applied to such attorney with actual knowledge of another professional's loss of disinterestedness.

█ Weil, Gotshal nowhere argues that inadvertence, reliance on other professionals to handle the matter, pressure of other estate duties, or the like were the cause of its failure either to require Zolfo, Cooper to make full disclosure to the creditor body and the court or to advise the Board to take such action itself. The rule of law of no responsibility proposed by Weil, Gotshal, and concurred in by the U.S. Trustee, cannot be consonant with the fiduciary responsibilities imposed on bankruptcy estate professionals. The general concerns of the Code and the courts to promote public confidence in the integrity of the bankruptcy system are compelling reasons to apply a prophylactic rule in considering the extent of the fiduciary duties of an attorney for a debtor in possession.

The court concludes that Weil, Gotshal's considered refusal to have the matter of Cooper's disinterestedness brought before the court is a sufficient basis to reduce the compensation otherwise due Weil, Gotshal. Taking into account the newness of the issue, the court reduces the compensation otherwise allowed by $250,000.

## IV.

### CONCLUSION

The Zolfo, Cooper fee application is denied in the amount of $795,484.59 and allowed in the amount of $1,443,075.82.

The Weil, Gotshal fee application requests $2,210,767.66 compensation and $18,268.69 expense reimbursement, of which $763,122.91 for services and $47,192.50 expenses was previously paid as interim fees and expenses. Based upon objection by the U.S. Trustee, Weil, Gotshal has consented to a reduction of $30,411.00 in expenses, and $53,170.00 in compensation. The court, by this ruling, has ordered a further reduction of $250,000.00, making total deductions of $333,581.00, and leaving as allowed final compensation and expense reimbursement the sum of $1,995,-455.31. Weil, Gotshal has already received the sum of $810,315.41, leaving the further sum of $1,185,139.94 approved, but not ordered paid at this time. It is

SO ORDERED.

8. Unlike a trustee, a debtor in possession is not entitled to compensation. *See supra* note 3.