In re Carl Martin RHEUBAN a.k.a.
Carl M. Rheuban, Debtor.

Bankruptcy No. LA 90–10202–VZ.

United States Bankruptcy Court,
C.D. California.

Nov. 16, 1990.

Dean Ziehl, Pachulski, Stang & Ziehl, Los Angeles, Cal., for O'Neill & Lysaght.

Lawrence Diamant, Chapter 11 Trustee, Robinson, Diamant, Brill & Klausner, Los Angeles, Cal., for trustee.

Randye B. Soref, Wolas, Soref & Ickowicz, Los Angeles, Cal., for Creditors' Committee.

VINCENT P. ZURZOLO, Bankruptcy Judge.

## I.

## INTRODUCTION

On June 6th, 1990, I conducted a hearing (the "Trustee Hearing") on the motion of the official committee of unsecured creditors in this Chapter 11 case (the "Committee") for an order directing the United States Trustee to appoint a trustee to serve as the fiduciary of this bankruptcy estate in place of the then debtor in possession, Carl M. Rheuban ("Debtor"). After considering declarations, memoranda of points and authorities, testimony and extensive oral argument, I ordered the United States Trustee to appoint a trustee.

In preparing for the Trustee Hearing, I reviewed the Schedules and Statement of Financial Affairs filed and executed under penalty of perjury by Debtor. In response to question 15 in his Statement of Financial Affairs, Debtor disclosed that he had transferred within the year immediately preceding April 26th, 1990, the date the Debtor voluntarily commenced his chapter 11 case, more than two million dollars to eight different legal professionals. As the Debtor is an individual who has "nominal" cash on hand and less than one thousand dollars in deposits of money, (Debtor's Schedule B–2, items a and b), I became concerned with the reasonableness of the transfers to the various legal professionals employed by Debtor prior to filing this case.

My concern was deepened by Debtor's failure to disclose the amount of compensation paid to one legal professional, Rogers & Wells, and his disclosure of the large amounts of compensation paid to two other professionals: $400,000 to Levene & Eisenberg ("L & E")[1] and approximately one million five hundred thousand dollars to O'Neill & Lysaght ("O & L").

In addition to appointing a trustee in the Rheuban case, I directed counsel for the Committee to prepare orders requiring the legal professionals who had received compensation from Debtor within the year immediately preceding the commencement of this bankruptcy case to show cause why the compensation they had received should not be disgorged as being unreasonable under 11 U.S.C. § 329. On June 15, 1990 the clerk of the court entered my "Order to Show Cause Why Attorneys Should Not Disgorge Attorneys Fees" (the "OSC").

In open court at the Trustee Hearing, I set the hearing date on the § 329 orders to show cause for August 6th, 1990. Dean Ziehl of Pachulski, Stang & Ziehl, counsel for O & L, requested an earlier hearing date for O & L as O & L wanted a resolution of the issue as quickly as possible. Accordingly, I conducted a hearing on O & L's response to the OSC on July 17, 1990, some three weeks before the hearing regarding the other attorneys hired by Debtor.

On July 30, 1990, the Clerk of this Court entered my "Memorandum of Decision Re Reasonableness of Compensation Paid to O'Neill & Lysaght" (the "Memorandum"). Within ten (10) days of July 30, 1990, O & L filed its "Ex Parte Motion For An Order: (1) Granting Extension of Time for Filing of Appeal of July 30, 1990 Order; and (2) Staying the Enforcement of the July 30, 1990 Order until Ten Days After Hearing on the Concurrently–Filed Motion for Re-

1. By the time of the Trustee Hearing, I had conducted a hearing on L & E's application for an order approving its employment as special bankruptcy counsel for Hathaway Ranch Partnership, a California limited partnership and a debtor in possession in a related chapter 11 bankruptcy case. Debtor was the general partner in an entity known as CRS Associates, a California limited partnership, which in turn was the general partner in Hathaway. For many reasons that I expressed in detail in *In re Hathaway Ranch Partnership,* 116 B.R. 208 (Bkrtcy.C.D.Cal.1990), I concluded that L & E was disqualified from representing Hathaway and that it was required to segregate in a client trust fund account for turnover to the fiduciary of Hathaway's bankruptcy estate the $50,000 advance fee payment that L & E received prior to the commencement of the Hathaway case.

consideration" (the "Emergency Motion"). I granted the Emergency Motion in part and ordered that: (1) enforcement of the Memorandum be stayed; and (2) O & L be allowed an extension of time to file its notice of appeal of the Memorandum until I ruled on O & L's "Motion for a New Trial and/or Modification of July 30, 1990 Order" (the "Modification Motion").

This Revised Memorandum modifies and supplants the Memorandum and constitutes my findings of fact, conclusions of law, and order regarding the Modification Motion. In the interest of clarity and completeness, the Revised Memorandum incorporates a substantial portion of the Memorandum which is unaffected by my ruling on the Modification Motion.

## II.

## ISSUES

In this memorandum, I address only the issues raised by the "Response of O'Neill & Lysaght to Order to Show Cause Re Payment of Fees" (the "O & L Response"), the declarations submitted in support of the O & L Response, the Committee's rejoinder to the O & L Response, O & L's reply to the Committee's rejoinder, the Emergency Motion, the Modification Motion, and the supplemental material submitted by O & L for *in camera* inspection by me. See Section IV, D, 1 *infra.* I will address the responses of the other legal professionals compensated by Debtor separately.

O & L makes four arguments in response to the OSC:

(1) The services provided by O & L to Debtor are not subject to my examination under § 329(b) because these services were not rendered in a bankruptcy case or in connection with a bankruptcy case;

(2) Assuming that O & L's compensation was within the scope of § 329(b), it is procedurally improper to examine O & L's compensation by way of an order to show cause or other summary proceeding;

(3) O & L has a right to a jury trial on all issues of fact in a § 329(b) matter;

(4) O & L's compensation agreement with Debtor and compensation received by O & L under the agreement are reasonable.

## III.

## FACTS

Debtor was the controlling person of First Network Savings Bank ("FNSB"), a troubled savings and loan association. FNSB is currently in receivership under the control of the Resolution Trust Corporation ("RTC"). Debtor was and is under investigation by the Federal Deposit Insurance Corporation, the Office of Thrift Supervision, the Federal Bureau of Investigation, the California Department of Savings and Loans and the United States Attorney. These investigations focus upon Debtor's business relationships with FNSB and related entities.

Debtor first came to O & L for legal services on or about January 14th, 1990. O & L is an eleven lawyer firm that specializes in civil business litigation and criminal defense work. According to the declarations of Bryan O'Neill, (the "O'Neill Declarations") a principal in O & L, 60% of O & L's practice is "traditional commercial litigation" and 40% is "white collar criminal defense."

On January 19th, 1990, O & L and Debtor entered into an employment agreement (the "First Agreement"). The First Agreement provides that "the guideline for the fair value of those services is the hourly rate of each lawyer and support person." Debtor gave O & L a $25,000 advance fee payment that was deposited in a client trust fund account.

On February 23rd, 1990, Debtor and O & L entered into a second employment agreement (the "Agreement") that superseded the First Agreement. According to the O'Neill Declarations and the copy of the Agreement attached to it as Exhibit B, Debtor and O & L, *inter alia,* agreed to the following:

a. O & L would represent Debtor in connection with the investigation and litigation of "possible criminal and regulatory matters arising out of [Debt-

or's] business relationship with [FNSB];"

b. Debtor would compensate O & L for the above described legal services by paying O & L 1.5 million dollars (the "Fee"). In addition to providing legal services, O & L would pay independent costs including court fees, investigator fees, expert fees, and the hiring of "persons possessing special skills or expertise, [who are] not employees of this firm;"

c. The Fee was a "flat non-refundable fee." According to the O'Neill Declarations, this means that O & L is obliged to provide all the legal services it contracted to provide to Debtor whether or not the value of those services exceeded the Fee. Further, O & L "specifically advised Mr. Rheuban that there would be no 'winks' or 'nods' and that under no circumstances would [Rheuban] be entitled to the return of any portion of the [Fee];"

d. The Fee was to be paid by Debtor by assigning his complete interest as the 100% stockholder of Pilgrim Life Insurance Company ("Pilgrim") to O & L and his personal partnership interests in three real estate limited partnerships. Debtor was to liquidate immediately his interest in Pilgrim and turn over the proceeds to O & L; and

e. O & L reserved the right to withdraw from representing Debtor if he did not pay the Fee or if continuing O & L's representation of Debtor was not in the best interest of O & L or Debtor.

According to the O'Neill Declarations, O & L received from Debtor an assignment of his interests in the Pilgrim stock and the real property limited partnerships. On April 25th, 1990, the day before Debtor voluntarily commenced this chapter 11 bankruptcy case, O & L received $763,-754.69 in cashier's checks from Debtor. That same day, O & L transferred $400,000 in cash to L & E in exchange for L & E transferring to O & L real estate located at 312 Texas Street, San Francisco, California (the "Texas Street Property"). Earlier, Debtor had transferred the Texas Street Property to L & E as, what L & E described, an "earned upon receipt" retainer to compensate L & E acting as special bankruptcy counsel to Debtor and entities related to Debtor, including Hathaway. *See In re Hathaway Ranch Partnership,* 116 B.R. 208 (Bankr.C.D.Cal.1990). According to O & L, O & L transferred $400,-000 in cash to L & E for the Texas Street Property upon the advice and at the request of L & E. O & L did not explain why it would agree to such a request if the Fee was truly its property and if O & L was free to do with the Fee as it wished without any "winks" or "nods" between Debtor and O & L.

Although O & L has kept detailed time records of the services it has provided Debtor, O & L did not submit any time records in support of the O & L Response. The only description of legal services O & L provided in response to the OSC is set forth in four short paragraphs of the O'Neill Declarations. These services included "interfacing" with the United States Attorney's office, consulting with Debtor regarding documents demanded by the California Department of Savings & Loan and FNSB's attorneys, and attending hearings conducted by state regulators and the Attorney General of California.

Attached as Exhibit C to the first O'Neill Declaration is a one-page "Accounting of Cash Receipts and Disbursements as of June 25th, 1990: Carl Rheuban" (the "Accounting"). The Accounting reveals that O & L has disbursed $66,850 in costs and $114,148.75 in fees. O & L did not disclose in the O & L Response, the Accounting, or the O'Neill Declarations its time records regarding Debtor, the necessity for and purpose of disbursing cash to accountants and investigators, or a breakdown of so-called "internal costs" totalling $7,319.

After issuance of the Memorandum, O & L submitted to me for *in camera* review detailed billing records and time sheets regarding services provided by O & L to Debtor from the beginning of their relationship through the date that the OSC was served upon O & L.

It is undisputed that O & L has represented Debtor after the commencement of this chapter 11 bankruptcy case. Nevertheless, O & L has not filed an application for an order approving its employment pursuant to 11 U.S.C. § 327. O & L did not file a statement disclosing its relationship with Debtor, the Agreement, the Fee or its sharing of the Fee with L & E under 11 U.S.C. § 329(a) and Bankruptcy Rule 2016 until June 6, 1990, twenty-six days after the deadline set for such filings by Bankruptcy Rule 2016(b).

Further, O & L apparently continues to represent Debtor, including representation at 11 U.S.C. § 341(a) meetings of creditors at which O & L apparently advised Debtor not to answer any questions regarding his business affairs by invoking his Fifth Amendment privilege.

## IV.

## ANALYSIS

A. *The Scope of § 329(b) and Bankruptcy Rule 2017(a).*

11 U.S.C. § 329 provides as follows:

§ 329. Debtor's transactions with attorneys.

(a) Any attorney representing a debtor in a case under this title, or in connection with such a case, whether or not such attorney applies for compensation under this title, shall file with the court a statement of the compensation paid or agreed to be paid, if such payment or agreement was made after one year before the date of the filing of the petition, for services rendered or to be rendered in contemplation of or in connection with the case by such attorney, and the source of such compensation.

(b) If such compensation exceeds the reasonable value of any such services, the court may cancel any such agreement, or order the return of any such payment, to the extent excessive, to—

(1) the estate, if the property transferred—

(A) would have been property of the estate; or

(B) was to be paid by or on behalf of the debtor under a plan under chapter 11, 12, or 13 of this title; or

(2) the entity that made such payment.

Bankruptcy Rule 2017(a) provides:

(a) **Payment or Transfer to Attorney Before Commencement of Case.** On motion by any party in interest or on the court's own initiative, the court after notice and a hearing may determine whether any payment of money or any transfer of property by the debtor, made directly or indirectly and in contemplation of the filing of a petition under the Code by or against the debtor, to an attorney for services rendered or to be rendered is excessive.

■ Subsection (a) of § 329 requires the filing of a statement by an attorney who has received compensation from a debtor within the year immediately preceding the commencement of the debtor's bankruptcy case if the attorney is providing legal services in the case or if the attorney has provided or is providing services that are connected to the case. Subsection (a) of § 329 is derived from former Bankruptcy Rule 219(b).[2]

■ Subsection (b) of § 329 empowers the bankruptcy court to cancel any agreement for compensation or to order the return of unreasonable compensation to the entity that paid it. Subsection (b) of § 329 is derived from former Bankruptcy Rule

2. Former Rule 219(b) provided:

"(b) **Disclosure of Compensation Paid or Promised to Attorney for Bankrupt.** Every attorney for a bankrupt, whether or not he applies for compensation, shall file with the court on or before the first date set for the first meeting of creditors, or at such other time as the court may direct, a statement setting forth the compensation paid or promised him for the services rendered or to be rendered in connection with the case, the source of the compensation so paid or promised, and whether the attorney has shared or agreed to share such compensation with any other person. The statement shall include the particulars of any such sharing or agreement to share by the attorney, but the details of any agreement for the sharing of the compensation with a member or regular associate of his law firm shall not be required."

220 which revised and superseded § 60(d) of the Bankruptcy Act.[3]

Due to the similarities of the language of § 329 and Bankruptcy Rule 2017(a) to the language of their respective predecessors, I conclude that decisions interpreting and applying the predecessors of § 329 and Bankruptcy Rule 2017(a) remain persuasive and, in certain instances, are controlling in my interpretation and construction of § 329 and Bankruptcy Rule 2017(a). 2 *Collier on Bankruptcy* ("Collier"), ¶ 329.02 (15th ed. 1989); *Compare, In re Wood and Henderson,* 210 U.S. 246, 253, 28 S.Ct. 621, 624–25, 52 L.Ed. 1046 (1908) (stating the policy behind former § 60(d)) and H.R. REP. No. 595, 95th Cong., 1st Sess. 329 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 39 (1978), U.S.Code Cong. & Admin.News 1978, p. 5787 ("House Report") (legislative history of § 329 concerning the policy behind and purpose of § 329).

The policy implemented by § 329 and Bankruptcy Rule 2017(a) and their predecessors is best described by the United States Supreme Court (the "Court") in its decision *Conrad, Rubin & Lesser v. Pender,* 289 U.S. 472, 476–477, 53 S.Ct. 703, 704–05, 77 L.Ed. 1327 (1933):

"The manifest purpose of the provision is to safeguard the assets of those who are acting in contemplation of bankruptcy, so that these assets may be brought quickly and without unnecessary expense into the hands of the trustee, and to provide a restraint upon opportunities to make an unreasonable disposition of property through arrangement for excessive payments for prospective legal services. [citing *Wood and Henderson*] We said in the case of *Wood and Henderson* that the statute 'recognizes the temptation of a failing debtor to deal too liberally with his property in enabling counsel to protect him in the view of financial reverses in probable failure. It recognizes the right of such a debtor to have the aid and advice of counsel, and, in contemplation of bankruptcy proceedings which will strip him of his property, to make provisions for *reasonable* compensation to his counsel." (emphasis added).

In enacting § 329, Congress has reaffirmed the statement of the policy and purpose behind this provision of the Bankruptcy Code. *See,* House Report, *construed in* Collier, ¶ 329.01, at 329-2 ("payments to a debtor's attorney provides 'seri-

3. Former Rule 220 provided that:

"(a) **Payment or Transfer to Attorney in Contemplation of Bankruptcy.**—On motion by any party in interest or on the court's own initiative, the court may examine any payment of money or any transfer of property by the bankrupt, made directly or indirectly and in contemplation of the filing of a petition by or against him, to an attorney for services rendered or to be rendered.

"(b) **Payment or Transfer to Attorney, or Agreement Therefor, After Bankruptcy.**—On motion by the bankrupt or on the court's own initiative, the court may examine any payment of money or any transfer of property, or any agreement therefor, by the bankrupt to an attorney after bankruptcy, whether the payment or transfer is made or is to be made directly or indirectly, if the payment, transfer, or agreement therefor is for services in any way related to the bankruptcy.

"(c) **Invalidation of Unreasonable Payment, Transfer, or Obligation.**—Any payment, transfer, or obligation examined under subdivision (a) or (b) of this rule shall be held valid only to the extent of a reasonable amount as determined by the court. The amount of any excess found to have been paid or transferred under subdivision (a) or (b) may be recovered

for the benefit of the estate or the bankrupt, as their interests may appear, and any obligation found to be excessive may be cancelled to the extent of the excess."

Former Section 60(d) provided:

"(d) If a debtor shall, directly or indirectly, in contemplation of the filing of a petition by or against him, pay money or transfer property to an attorney at law, for services rendered or to be rendered, the transaction may be examined by the court on its own motion or shall be examined by the court on petition of the trustee or any creditor and shall be held valid only to the extent of a reasonable amount to be determined by the court, and the excess may be recovered by the trustee for the benefit of the estate.

"If, whether before or after filing, a debtor shall agree orally or in writing to pay money or transfer property to an attorney at law after the filing, the transaction may be examined by the court on its own motion or shall be examined by the court on petition of the bankrupt made prior to discharge and shall be held valid only to the extent of a reasonable amount to be determined by the court, and any excess obligation shall be canceled, or if excess payment or transfer has been made, returned to the bankrupt."

ous potential' for both 'evasion of creditor protection provisions of the bankruptcy laws' and 'overreaching by the debtor's attorney.' ")

In considering the plain language of § 329 and Bankruptcy Rule 2017(a), the policies underlying these provisions and their predecessors, and the Court's decisions interpreting predecessors to these provisions, it is difficult to understand how O & L can argue that § 329 and Bankruptcy Rule 2017(a) do not empower me to examine the Fee and the Agreement. O & L does, however, and asserts that:

a. Subsection (b) of § 329 allows the court to examine "such compensation,"

b. the adjective "such" refers to compensation paid for services rendered by an attorney "in a case under this title, or in connection with such a case" and does not refer to compensation paid for services rendered or to be rendered "in contemplation of or connection with the case", and

c. O & L did not render and is not rendering services in this bankruptcy case or in connection with this bankruptcy case.

▮ First, O & L's construction of § 329, and specifically the type of compensation referred to by the adjective "such" in subsection (b) is wrong. "Such", by the commonly accepted rules of grammar, H.W. Fowler, *A Dictionary of Modern English Usage*, 602 (2d ed. 1965), refers to the immediately preceding description of compensation. The immediately preceding description of "compensation" is that paid for services rendered or to be rendered in contemplation of or connection with the case. This construction is supported by the language of Bankruptcy Rule 2017(a). *See also* Collier, ¶ 329.03, at 329–10. Further, O & L's construction of § 329 would require this court to ignore eighty-two years of consistent and unbroken judicial and congressional interpretation of § 329 and its predecessors. O & L has submitted no evidence or argument that persuades me that at the time of § 329's enactment Congress intended to change its scope.

Even if O & L's statutory construction argument had any merit, it is irrelevant if the legal services O & L has rendered or will render to Debtor have any connection with this bankruptcy case, as opposed to being rendered in contemplation of this bankruptcy case. I find and conclude that O & L's legal services to Debtor were rendered both in contemplation of this bankruptcy case *and* in connection with this case.

1. In Connection with the Case.

▮ The Agreement provides that O & L is to provide legal services to Debtor with regard to criminal and regulatory matters arising out of Debtor's business relationship to FNSB. Debtor was a 100% shareholder in FNSB and a controlling person in its operations. It cannot be disputed that regulatory and criminal proceedings focused on Debtor's relationship with FNSB is currently having and will continue to have a substantial impact on this bankruptcy case. The clearest example of this is Debtor's refusal to respond to any questions regarding his business affairs at the 11 U.S.C. § 341(a) meetings of creditors conducted in this bankruptcy case. O & L represented Debtor at these meetings and apparently advised Debtor regarding his invocation of the Fifth Amendment.

In the Agreement, O & L agreed to represent Debtor in "possible criminal and regulatory matters *arising out of [Debtor's] business relationship* with [FNSB]." (Emphasis added). The O'Neill Declarations reveal that the services rendered by O & L to Debtor concerned Debtor's serious financial problems that have resulted in the investigations commenced by federal and state agencies. O & L's representation of Debtor, in criminal or civil matters, is directly related to the financial and business affairs of Debtor. From these facts, the only reasonable inference I can draw is that O & L's services were and are being rendered in connection with Debtor's attempt to reorganize his business affairs in this chapter 11 bankruptcy case.

▮ The phrase "in connection with" was not used in former § 60(d). The phrase "in any way related" was used, however, in former Rule 220(b) and is also

used in current Bankruptcy Rule 2017(b), which concerns examination of compensation paid *after* the commencement of bankruptcy case. One commentator reasons from these premises that the phrase "in connection with" brings within the reach of § 329 compensation that is "paid or promised" to the debtor's attorney at some point after the commencement of the bankruptcy case. Collier, ¶ 329.03, at 329–14—329–15. The commentator offers no support for this interpretation.

I can find no rational basis for imposing such a temporal restriction on the phrase "in connection with." Rather, I believe this phrase was added to § 329 so that a court would have an *objective* standard for reviewing whether or not compensation made to a debtor's attorney was subject to its review under § 329. This objective test supplements the *subjective* review embodied in the "in contemplation of" language of § 329 and its predecessors, § 60(d) and Bankruptcy Rule 220.

The subjective nature of the "in contemplation of" test is made clear by the Court in *Conrad, Rubin & Lesser v. Pender;*
"... the controlling question is with respect to the state of mind of the debtor and whether the thought of bankruptcy was the impelling cause of the transaction. [Citation] If the payment or transfer was thus motivated, it may be reexamined and its reasonableness be determined." 289 U.S. at 477, 53 S.Ct. at 705.

■ Thus I conclude that the "in connection with" language used in § 329 extends the scope of the Court's review to compensation paid by the debtor to an attorney any time after one year prior to the commencement of the debtor's bankruptcy case, whether or not the court can make a subjective determination that the debtor was contemplating bankruptcy, *if* it can be objectively determined that the services rendered or to be rendered by the attorney have or will have an impact on the bankruptcy case.

Of course it is possible that there are services that an attorney could render to a debtor within the time period set by § 329 that would have no impact on the debtor's

bankruptcy case and therefore would not be in connection with the case. *See, Matter of Hargis,* 895 F.2d 1025, 1026 (5th Cir.1990). For the reasons stated above, however, I find that O & L has provided and is providing services in connection with this case to Debtor.

2. In Contemplation Of.

■ As discussed in Section IV, A, 1 above, this portion of § 329 allows a court to examine compensation paid by a debtor to an attorney if the services rendered by the attorney or an agreement for legal services was reached by the debtor and the attorney at a time the debtor was contemplating bankruptcy. Under this test it does not matter what the nature of the legal services are. *Conrad, Rubin & Lesser v. Pender,* 289 U.S. at 476, 53 S.Ct. at 704 ("[Section 60d] contains no intimation of an intention to limit the jurisdiction to reexamine to a particular sort of legal services for the payment of which the debtor has disposed his property"); *In re Habegger,* 139 F. 623 (8th Cir.1905) (compensation paid to attorney hired prior to commencement of bankruptcy case to defend debtor in criminal prosecutions in which no charges were brought prior to the commencement of the case is subject to reexamination under predecessor to § 329); *Quinn v. Union National Bank of Rochester,* 32 F.2d 762 (8th Cir.1929) (agreement in which attorneys agreed to render legal services to debtor in defense of criminal and civil actions, pending or potential, arising out of debtor's position as treasurer of the South Dakota Rural Credit Board and as an officer of the National Bank of Commerce of Pierre, South Dakota).

■ It is often difficult to obtain reliable and direct evidence of a person's intent. *Cf., In re Adeeb,* 787 F.2d 1339, 1342 (9th Cir.1986). I received no evidence from Debtor in response to the OSC. The O'Neill Declarations, however, make it clear that O & L was hired in contemplation of bankruptcy;
"Throughout O & L's representation of Mr. Rheuban, *we have relied exclusively on bankruptcy counsel,* and specifically

Levene & Eisenberg ("L & E"), through Joseph A. Eisenberg, to advise us concerning all actions we have taken in connection with the receipt of the [Fee]." First O'Neill Declaration, page 23, paragraph 13, lines 5–9 (emphasis added).

The testimony in the O'Neill Declarations establishes that Debtor was contemplating bankruptcy when he met with O & L, entered into the Agreement, and paid the Fee. It makes no difference if Debtor was contemplating the avoidance of bankruptcy in hiring L & E and O & L. *Conrad, Rubin & Lesser v. Pender,* 289 U.S. at 478–479, 53 S.Ct. at 705. Based upon the foregoing I find that O & L rendered services, made the Agreement, and received the Fee when Debtor was in contemplation of bankruptcy.

B. *The Propriety of Using an Order to Show Cause Under § 329 and Bankruptcy Rule 2017(a).*

■ O & L argues in Footnote 1 of the O & L Response that it is not "constitutionally permissible" for this court to examine the Fee and the Agreement under § 329 and Bankruptcy Rule 2017(a) in a summary proceeding such as that commenced by an order to show cause. In support of this assertion, O & L cites *Granfinanciera S.A. v. Nordberg,* 492 U.S. 33, 109 S.Ct. 2782, 106 L.Ed.2d 26 (1989). O & L did not refer to any particular portion of the *Granfinanciera* decision that supports its assertion. After reviewing the entire *Granfinanciera* decision, I find nothing in it that is remotely related to O & L's argument.

The Court did speak directly on this point, however, in *In re Wood and Henderson,* 210 U.S. 246, 28 S.Ct. 621, 52 L.Ed. 1046 (1908). In that case, the attorney whose compensation was challenged under former § 60(d) argued that the district court sitting in bankruptcy could not exercise its jurisdiction under § 60(d) by means of an order to show cause. After extensively considering all pertinent authorities, the Court concluded that a proceeding under § 60(d) is administrative in character, is to be distinguished from an action for a preference or fraudulent transfer as it is not a suit or cause of action as

those terms are commonly used, and is appropriately initiated by an order to show cause. *In re Wood and Henderson,* 210 U.S. at 258, 28 S.Ct. at 626–27.

The *Wood and Henderson* court also makes it clear why proceedings under former § 60(d) and current § 329 can be conducted in a summary manner: examination of an attorney's compensation by a court is unique due to the attorney's position as an officer of the court who holds special fiduciary duties to his client and to the court. The special relationship between the attorney and the client is vulnerable to overreaching by the attorney when the client faces financial trouble and is in contemplation of bankruptcy and may provide an unscrupulous debtor a convenient mechanism for hiding assets from creditors. 210 U.S. at 252–253, 28 S.Ct. at 624–25; Bankr. Rule 2017, Advisory Committee note; Collier, Bankruptcy ¶ 329.02, at 329–5.

■ The Court reaffirmed its position that a bankruptcy court may act under § 329 and Bankruptcy Rule 2017 in a summary fashion, and not by full adversary proceeding, by promulgating Bankruptcy Rule 7001(1), which expressly excepts from the list of disputes that must be heard by way of an adversary proceeding, matters that arise under Bankruptcy Rule 2017. Of course, matters under § 329 and Bankruptcy Rule 2017 can be conducted only after appropriate notice and hearing. Bankruptcy Rule 2017. The Court has also made it clear in the language of Bankruptcy Rule 2017 that examinations of an attorney's compensation under § 329 may be initiated by the court.

It is curious that O & L complains of the summary nature of this court's examination of the Fee and Agreement when its counsel requested that the court accelerate the hearing on the OSC with regard to O & L. O & L's request to hasten the hearing and then complaining of its summary nature undercuts any persuasiveness in its arguments.

C. *Right to a Jury Trial Under § 329 and Bankruptcy Rule 2017(a).*

O'Neill's response to the order to show cause includes a footnote which asserts a

right to trial by jury. Because O'Neill did not demand a jury trial at the end of the O & L Response, or in its caption, O'Neill may have waived its right to a jury trial.[4] Assuming that such a request was appropriate, however, I conclude as a matter of law that O'Neill is not entitled to trial by jury.

### 1. Sources of Law for Right to Jury Trial

The right to jury trial in federal court must be derived from one of two sources: first, a statute; or second, the seventh amendment. *Granfinanciera, S.A. v. Nordberg,* 492 U.S. 33, 109 S.Ct. 2782, 2790, 106 L.Ed.2d 26 (1989).

The seventh amendment provides: "In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved...."[5] The Court has interpreted the phrase "Suits at common law" to refer to "suits in which legal rights were to be ascertained and determined, in contradistinction to those where equitable rights alone were recognized, and equitable remedies were administered." *Granfinanciera, S.A. v. Nordberg,* 109 S.Ct. at 2790 (1989), *quoting Parsons v. Bedford,* 3 Pet. 433, 447, 7 L.Ed. 732 (1830). The test adopted by the Court for determining the right to a jury trial is: "First, we compare the statutory action to 18th–century actions brought in the courts of England prior to the merger of the courts of law and equity. Second, we examine the remedy sought and determine whether it is legal or equitable in nature." *Id., quoting Tull v. United States,* 481 U.S. 412, 417–418, 107 S.Ct.

1831, 1835, 95 L.Ed.2d 365 (1987). The second stage of this analysis is more important than the first. *Id.* 109 S.Ct. at 2790.[6]

### A. Statutory Basis

The provisions of the Code and the Bankruptcy Rules which confer jurisdiction and govern the manner in which the court may review compensation to attorneys, 11 U.S.C. § 329(b) and Bankruptcy Rule 2017(a), do not confer a right to a jury trial in such a proceeding. O'Neill has not cited any statute that grants a right to jury trial under § 329. Therefore, I conclude that there is no statutory right to a jury trial in this hearing.

### B. Seventh Amendment

Prior to the Act of 1898, a statute similar to § 329 did not exist. *In re Wood and Henderson,* 210 U.S. 246, 28 S.Ct. 621, 52 L.Ed. 1046 (1908); King, Collier on Bankruptcy, § 60, ¶ 60.68[1] (14th ed. 1977). This statutory scheme is not analogous to any cause of action ordinarily decided by English common-law courts in the late 18th century, as opposed to those customarily heard by courts of equity. Section 329(b), like its predecessor, provides courts the authority to monitor the special relationship between debtors and their attorneys. *In re Wood and Henderson,* 210 U.S. at 253, 28 S.Ct. at 624–25.

In *Wood and Henderson,* the trustee filed a petition under section 60(d) for the reexamination of payments made to attorneys for their services. The responding party apparently demanded a trial by jury

---

**4.** Local Bankruptcy Rule ("LBR") 103(12) provides that a party demanding a jury trial shall set forth such request at the end of the pleading, and the caption of such pleading shall contain a "DEMAND FOR JURY TRIAL." LBR 106(1) provides that failure to conform with the Local Bankruptcy Rules shall subject the offending party or counsel to such penalties as the Court may deem proper, including, *inter alia,* the deemed waiver of rights. *Cf., Hughes–Bechtol, Inc., v. Air Enterprises, Inc.,* 107 B.R. 552 (Bankr.S.D.Ohio 1989).

**5.** The seventh amendment codified existing law. It did not purport to require a jury trial where

none was required before. *Atlas Roofing Co., Inc. v. Occupational Safety and Health Review Commission et al.,* 430 U.S. 442, 459, 97 S.Ct. 1261, 1271, 51 L.Ed.2d 464 (1977). Moreover, it did not seek to change the factfinding mode in equity or freeze equity jurisdiction as it existed in 1789. *Id.*

**6.** The United States Supreme Court has also created an exception to the jury trial right in the arena of "public rights." I will discuss the applicability of this doctrine in section IV, C, of this opinion.

and the Court addressed the issue concluded there was no such right:

"Section 60(d) is *sui generis,* and does not contemplate the bringing of plenary suits or the recovery of preferential transfers in another jurisdiction. It recognizes the temptation of a failing debtor to deal too liberally with his property in employing counsel to protect him in view of his financial reverses and probable failure ... And in view of the circumstances the act makes provision that the bankruptcy court administering the estate may, if the trustee or any creditor question the transaction, reexamine it with a view to a determination of its reasonableness" 210 U.S. at 253; *see also In re Lewin,* 103 F. 850 (DC Vt. 1900).

Not only are proceedings under § 329(b) distinct from preference or fraudulent transfer actions under 11 U.S.C. §§ 547 and 548, respectively, but they are not "suits" within the meaning of the seventh amendment. The Court stated:

"This *is not a suit* such as is mentioned in [the applicable jurisdictional statute], but is an administrative proceeding, of which the bankruptcy court has express jurisdiction, given by this clause 'd' of section 60, if it would not have any by the general grant of jurisdiction over bankrupts and their estates, and of their attorneys in the proceedings, as officers of the court." *Wood and Henderson,* 210 U.S. [at] 254, 28 S.Ct. [at] 621, (*quoting In re Lewin,* 103 F. 850 (DC Vt.1900) (emphasis added)).

Based on the conclusion that there was no analog to § 60(d) prior to the Act, and that such proceedings were not suits within the meaning of the seventh amendment, the Court held that there was no right to trial by jury. *Wood and Henderson,* 210 U.S. at 258, 28 S.Ct. at 626–27.

Similarly, in *In re Buchanan,* 66 F.2d 416 (2d Cir.1933), the trustee filed a petition under § 60(d) to reexamine payments to attorneys for their services. The attorneys argued that they had a constitutional right to trial by jury. Citing *Wood and Henderson,* the court summarily concluded that there was no right to trial by jury. *Id.,* at 419.

Based on the foregoing, I conclude that the seventh amendment does not entitle O & L to a jury trial because the nature of the "suit" is not legal. However, assuming for the sake of argument that § 329 creates a legal claim, under the "public rights" doctrine O & L is not entitled to a jury trial.

### 2. *Public Rights Doctrine*

In cases where "public rights" are concerned Congress may assign the adjudication to an administrative forum without violating the mandate of the seventh amendment. Traditionally, "public rights" involved only cases in which the United States government sued in its sovereign capacity to enforce rights created by statutes within the power of Congress to enact. *Atlas Roofing Co., Inc. v. Occupational Safety and Health Review Commission et al.,* 430 U.S. 442, 450, 97 S.Ct. 1261, 1266–67, 51 L.Ed.2d 464 (1977). Recent cases, however, have expanded the notion of "public rights" to matters that appear to involve private rights.[7] These cases, discussed below, uniformly hold that Congress can create a statutory right and entrust its enforcement to an administrative agency or a specialized judicial tribunal that does not utilize juries as factfinders without violating the strictures of the seventh amendment. *See Crowell v. Benson,* 285 U.S. 22, 50–51, 52 S.Ct. 285, 292–93, 76 L.Ed. 598 (1932).

In *NLRB v. Jones & Laughlin Steel Corp.,* 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893 (1937), Congress enacted the National Labor Relations Act. This statute entrusted to the National Labor Relations Board the task of deciding whether an unfair labor practice had been committed and of ordering backpay where appropriate. Ad-

---

7. *But see Granfinanciera, S.A. v. Nordberg,* 109 S.Ct. at 2802–2805, (Scalia, J., concurring). Justice Scalia argues persuasively that the public rights doctrine has been improperly expanded beyond those proceedings in which the United States is a party and its right are directly at issue.

dressing the right to jury trial in these proceedings, the Court held:

"The instant case is *not a suit at common law or in the nature of such a suit.* The proceeding is unknown to the common law. It is a statutory proceeding. Reinstatement of the employee and payment for time lost are requirements [administratively] imposed for violation of the statute and are remedies appropriate to its enforcement. The contention under the seventh amendment is without merit." *Id.,* at 48–49, 57 S.Ct. at 629 (emphasis added).

Similarly, a hearing under § 329 is not a suit at common law or even a suit at all. *Wood and Henderson,* 210 U.S. at 253–254, 28 S.Ct. at 624–25. As previously noted, a similar provision did not exist in prior Bankruptcy Acts. *Id.,* at 255, 28 S.Ct. at 625. My research has not revealed any suit at common law which is analogous to a proceeding under § 329.

In *Block v. Hirsh,* 256 U.S. 135, 41 S.Ct. 458, 65 L.Ed. 865 (1921), Congress enacted a statute applicable only in the District of Columbia temporarily suspending lessors' legal remedy of ejectment and relegating them to an administrative factfinding forum charged with determining fair rental rates at which tenants could hold over despite the expiration of their leases. The Court held:

"The statute is objected to on the further ground that landlords and tenants are deprived by it of a trial by jury on the right to possession of land. If the power of the Commission established by the statute to regulate the relation is established, as we think it is, by what we have said, this objection amounts to little. *To regulate the relation and to decide the facts affecting it are hardly separable."* *Id.,* at 158, 41 S.Ct. at 460 (emphasis added).

■ One could argue that the cases cited above are distinguishable as they involve the United States acting in its sovereign capacity. A careful reading of these cases leads me to conclude that the public rights doctrine extends beyond instances in which the United States is suing in its sovereign capacity. *See Thomas v. Union Carbide Agriculture Products Co.,* 473 U.S. 568, 105 S.Ct. 3325, 87 L.Ed.2d 409 (1985).

In *Thomas v. Union Carbide Agriculture Products Co.,* the Court considered the constitutionality of the adjudicative scheme established by Congress under the Federal Insecticide, Fungicide, and Rodenticide Act (the "FIFRA"). The FIFRA required manufacturers of pesticides, as a precondition for registering a product, to submit research data to the Environmental Protection Agency ("EPA") concerning the pesticide's health, safety, and environmental effects, and authorized the EPA to use previously submitted data in considering an application for registration of a similar product by another registrant ("follow-on" registrant). Such consideration of previously submitted data by the EPA was permissible under the FIFRA only if the follow-on registrant offered to compensate the original registrant for use of the data. The FIFRA also provided for binding arbitration if the registrants failed to agree on the amount of compensation and the arbitrator's decision was subject to judicial review by an Article III court only for fraud, misrepresentation, or other misconduct. An aggrieved registrant challenged the constitutionality of the arbitration provisions, arguing that it violated Article III.

The Court upheld the FIFRA provision holding, *inter alia* that: (1) Article III does not prohibit Congress from selecting binding arbitration with limited judicial review as the mechanism for resolving disputes under the FIFRA; (2) the Constitution does not require every federal question arising under the federal law to be tried in an Article III court; (3) the holding in *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982) that Congress may not vest in a non-Article III court the power to adjudicate a traditional contract action arising under state law, without the litigant's consent, was not controlling because the dispute over compensation at bar arises under the FIFRA and does not depend on or replace a right to such compen-

sation under state law; and (4) the public rights doctrine permits Congress to select a quasi-judicial method of resolving matters that could be conclusively determined by the executive and legislative branches.

■ Based on the foregoing survey of constitutional law, I conclude that the public rights doctrine empowers me to conduct the instant proceeding without encroaching on O & L's constitutional right to a trial by jury, assuming O & L has such a right. My duty under § 329 is to regulate transactions between debtors and their attorneys for reasonableness. The nature of this proceeding is administrative. *Wood and Henderson*, 210 U.S. at 254–258, 28 S.Ct. at 625–27. To regulate the transaction and to decide the facts are, in the Court's words, "hardly separable." *Block v. Hirsh*, 256 U.S. at 158, 41 S.Ct. at 460.

The facts in this case reveal that this proceeding concerns a public right. I am not determining the liability of one individual to another. Rather, I am implementing the will of Congress in determining the reasonableness of the Agreement and the Fee. The purpose of § 329(b), to protect debtors and their creditors from overreaching, is consistent with the fundamental policies underlying the Bankruptcy Code.

### D. *Reasonableness of the Agreement and the Fee Under § 329 and Bankruptcy Rule 2017(a)*

■ According to one of the authorities cited in the O & L Response, O & L has the burden of proof on all issues arising under § 329. *In re Swartout*, 20 B.R. 102, 105 (Bankr.S.D.Ohio 1982). I agree with this conclusion.

Section 329 and Bankruptcy Rule 2017(a) provide no guidance to courts in fashioning a test for determining the reasonableness of compensation. In the absence of express statutory or regulatory guidance, I conclude that it is appropriate to apply standards used by courts in determining professional compensation by the bankruptcy estate under § 330. These standards have been established by the Ninth Circuit.

*In re Yermakov*, 718 F.2d 1465 (9th Cir. 1983); *In re Manoa Finance Co.*, 853 F.2d 687 (9th Cir.1988).

■ According to this well-established body of law, I will consider the reasonableness of the Agreement and the Fee by applying the "lodestar approach." In applying this approach, it is necessary to know "both the number of hours reasonably spent and the reasonable hourly rate for the professional who provided the services in order to ascertain the appropriate compensation. The determination of the reasonable hourly rate ... must take into account 'the cost of comparable services other than in a [bankruptcy] case.'" *In re Gianulias*, 98 B.R. 27, 28 (Bankr.E.D.Cal. 1989), *aff'd*, 111 B.R. 867 (E.D.Cal 1989).

In *In re Yermakov*, the Ninth Circuit considered a contingency fee agreement made by a debtor with an attorney prior to the commencement of the debtor's bankruptcy case. The attorney eventually sought approval and allowance of his compensation pursuant to the contingency fee agreement. The trustee in the bankruptcy case objected, arguing that the attorney's compensation should be determined according to the lodestar approach. The Ninth Circuit agreed and concluded that the attorney's fee award should be calculated by the trial court by considering the hours of service provided by the attorney, the rate normally charged by the attorney in comparable cases in which an hourly fee basis is used, and the prevailing rate for such work in the area. *In re Yermakov*, 718 F.2d at 1471. The striking similarities between the facts considered by the court in *Yermakov* and the facts before me lead me to conclude that the reasonableness of the Fee and the Agreement must be measured against the lodestar approach.

Although the O'Neill Declarations disclose that O & L maintains records of time spent by its attorneys in representing it client, including Debtor, and has established hourly rates for such services, O & L refused to provide that data to the court with the O & L Response, although it was

O & L's burden to provide such evidence.[8]

■ O & L's apparent position is that the Agreement is *per se* reasonable without consideration of the lodestar approach mandated by the Ninth Circuit. This position is contrary to the teaching of the Ninth Circuit in *In re Yermakov*. It is also unsupported by the three reasons stated in the O & L Response, the O'Neill Declarations and the three declarations submitted in support of the O & L Response by attorneys with practices in Los Angeles similar to O & L's.

O & L first argues that the Agreement is reasonable because it is the general practice of all district judges in the Central District of California to refuse to permit an attorney to withdraw from criminal representation once an appearance has been made. Yet O & L concedes that it has not made an appearance in any district court action on behalf of Debtor as of yet. Further, O & L has the reserved the right to withdraw from representing Debtor in the Agreement.

Second, O & L argues that the Agreement is reasonable because compensation by an hourly rate would not adequately compensate an experienced, knowledgeable and skillful white collar criminal defense lawyer for his expertise and effectiveness in negotiating early favorable resolutions for his client. Stripped to its essentials, this argument states that a white collar criminal defense lawyer won't work hard to settle a case quickly unless he is paid a huge advance fee that he can treat as his own property and that possibly exceeds his hourly rate. A white collar criminal defense lawyer is required to do the best job he can for his client, as is every lawyer. If the best representation a lawyer can provide to his client includes a quick settlement or resolution of the client's problems, then the attorney must strive for that resolution. To require a client to pay more than a reasonable hourly rate in order to have the incentive to do what is already one's duty is clearly not reasonable under § 329.

Finally, O & L argues that white collar criminal lawyers usually have a single relationship with their clients. Therefore, there is no payment history to gauge the ability or willingness of the client to pay fees on an ongoing basis. This argument is unavailing because it describes the situation of nearly every attorney who represents a debtor in possession in a bankruptcy case. Nevertheless, the Ninth Circuit requires that compensation for counsel for debtors in possession be measured against the lodestar approach.

Based upon the foregoing, I find and conclude that the Agreement is not reasonable *per se.*

■ O & L argues that my conclusion may deny debtor and others similarly situated the right to be represented by the criminal defense counsel of their choice. The Court has made it clear that the Sixth Amendment only guarantees defendants in criminal cases the right to adequate representation, not representation by a particular attorney whom the defendant cannot afford. *Caplin & Drysdale v. United States,* 491 U.S. 617, 109 S.Ct. 2646, 2652, 105 L.Ed.2d 528 (1989) (Federal drug forfeiture statute does not violate Sixth Amendment by requiring forfeiture of advance fee payment made to defendant's counsel).

■ Also, requiring specific evidence as to the reasonableness of O'Neill's Fee would not violate either the attorney-client or attorney work product privileges. First, fee information is generally not privileged, *FSLIC v. Kimberleigh Ferm, et. al.,* 909 F.2d 372 (9th Cir.1990), *citing Tornay v. United States,* 840 F.2d 1424, 1426 (9th Cir.1988). The payment of fees is incidental to the attorney-client relationship, and does not usually involve disclosure of confidential communication arising from the professional relationship, *Tornay,* 840 F.2d at 1426. Moreover, any potential violation of these privileges can be avoided by an *in camera* review of fee statements. *See FSLIC v. Kimberleigh Ferm, et. al.,* 909

---

**8.** In supplemental declarations submitted after the hearing in this matter, O & L has provided detailed billing records.

F.2d 372 (9th Cir.1990) (the court made *in camera* review of fee invoices to determine reasonableness of fees paid to lawyer out of frozen assets).

■ It should be noted that it is not clear to what extent the services rendered by O & L to Debtor were criminal in nature. Despite the nature of the services, however, § 329 requires a showing by the attorney that the compensation paid for the services is reasonable. It is especially important for the attorney to make a strong showing of reasonableness of the compensation when the services are for criminal defense because it is unlikely that the creditors of the Debtor are liable to receive any benefit from such services. *Cf., In re Duque*, 48 B.R. 965 (Bankr.S.D.Fla.1984).

■ There is an independent and alternative basis for my conclusion that O & L must disgorge much of the Fee to the trustee in this case. O & L refused or failed to make a timely disclosure of the Fee and Agreement as required by § 329(a) and Bankruptcy Rule 2016(b).[9] O & L also refused or failed to file an application for an order approving its employment by Debtor when he was still a debtor in possession as required by 11 U.S.C. § 327(a). O & L's refusal or failure to do either of the above independently constitutes

grounds for ordering disgorgement of the Fee. *In re Futuronics Corp.*, 655 F.2d 463 (2d Cir.1981) (denial of all compensation appropriate sanction for failure to comply with former Rule 215, predecessor or Bankruptcy Rule 2016(b)); *In re Whitman*, 51 B.R. 502 (Bankr.D.Mass 1985); *In re Kero–Sun, Inc.*, 58 B.R. 770 (Bankr.Conn. 1986); *In re Georgetown of Kettering, Ltd.*, 750 F.2d 536 (6th Cir.1984); *In re Maller Restaurant Corporation*, 57 B.R. 72 (Bankr.E.D.N.Y.1985).

■ If O & L was providing services that only benefited Debtor yet were connected to the case, O & L was required to file a Bankruptcy Rule 2016(b) statement. To the extent O & L intended to provide legal services to Debtor as a debtor in possession, even if it did not intend to seek compensation from the bankruptcy estate, it was necessary for O & L to obtain the approval of this court according to the straightforward language of 11 U.S.C. §§ 327(a)[10], 1107(a)[11], and 1101(1).[12]

*In re Land*, 116 B.R. 798 (D.Colo.1990).

1. Reasonableness of compensation pursuant to In Camera Review of O & L's billing records.

■ Pursuant to the Modification Motion and O & L's submission of detailed

**9. Rule 2016(b):**

(b) **Disclosure of Compensation Paid or Promised to Attorney for Debtor.** Every attorney for a debtor, whether or not the attorney applies for compensation, shall file with the court within 15 days after the order for relief, or at another time as the court may direct, the statement required by § 329 of the Code including whether the attorney has shared or agreed to share the compensation with any other entity. The statement shall include the particulars of any such sharing or agreement to share by the attorney, but the details of any agreement for the sharing of the compensation with a member or regular associate of the attorney's law firm shall not be required. A supplemental statement shall be filed within 15 days after any payment or agreement not previously disclosed.

**10. § 327. Employment of professional persons.**

(a) Except as otherwise provided in this section, the trustee, with the court's approval, may employ one or more attorneys, accountants, appraisers, auctioneers, or other profes-

sional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title.

**11. § 1107. Rights, powers, and duties of debtor in possession.**

(a) Subject to any limitations on a trustee serving in a case under this chapter, and to such limitations or conditions as the court prescribes, a debtor in possession shall have all the rights, other than the right to compensation under section 330 of this title, and powers, and shall perform all the functions and duties, except the duties specified in sections 1106(a)(2), (3), and (4) of this title, of a trustee serving in a case under this chapter.

**12. § 1101. Definitions of this chapter.** In this chapter—

(1) "debtor in possession" means debtor except when a person that has qualified under section 322 of this title is serving as trustee in the case.

billing records, I have conducted a thorough *in camera* review of services provided by O & L to the Debtor from the beginning of their relationship through June 15, 1990, the date that the OSC was entered by the clerk of the court.[13]

 Based on my review I find that the $107,281.75 that O & L received for the pertinent time period is reasonable when measured against the services rendered to Debtor. I also find that the $66,293 of costs advanced by O & L for the benefit of Debtor is reasonable.

### VI.

### CONCLUSION

I have the power to examine the reasonableness of the Agreement and Fee through an order to show cause after reasonable notice and a hearing. O & L is not entitled to a trial by jury and has failed to carry its burden to establish that the Agreement and the Fee are reasonable. I therefore order O & L to disgorge $190,-179.94 [14] in cash and all non-cash assets transferred to it by Debtor, including the Texas Street Property, to Lawrence Diamant, the trustee in this chapter 11 bankruptcy case, by November 30, 1990.

---

**13.** Because of O & L's failure to submit an application for an order authorizing its employment by Debtor pursuant to 11 U.S.C. § 327 and because of its failure to submit a statement disclosing its representation of Debtor pursuant to Rule 2016(b), it would be appropriate to deny any compensation to O & L for services rendered after the commencement of this bankruptcy case. Because O & L has submitted evidence establishing that it does not practice regularly in this Court, has no expertise in bankruptcy law, relied upon the advice of counsel experienced in bankruptcy law in acting as it did, and acted as it did in good faith with no intention to mislead the Court or creditors of the estate, I find that it is appropriate to allow O & L reasonable compensation for services rendered through the date that the OSC was entered.

**14.** In the Memorandum, I ordered O & L to turn over all of the cash and non-cash assets that constituted the Fee. In the Modification Motion, O & L argued that this was inappropriate because it would require it to turn over both the Texas Street property and the $400,000 that it transferred to L & E. I agree and hereby modify the Memorandum by reducing the amount of cash that O & L must turn over by $400,000, the value I ascribe to the Texas Street Property pursuant to the evidence submitted to me. Therefore, based upon my findings concerning the reasonableness of the compensation received by O & L and my modification of the Memorandum, I order O & L to disgorge $190,-179.94, i.e., $763,754.69 (total cash received by O & L) – [$400,000 (cash transferred to L & E) + $173,574.75 reasonable fees and advancement of cost] = $190,179.94.